OLD DOMINION BRANCH NO . 496, NATIONAL
ASSOCIATION OF LETTER CARRIERS,
AFL–CIO, ET AL. *v.* AUSTIN ET AL.

No. 72–1180.  Argued November 14, 1973—
Decided June 25, 1974

*Mozart G. Ratner* argued the cause for appellants. With him on the brief were *George B. Driesen* and *Israel Steingold*.

*Parker E. Cherry* and *Stephen M. Kapral* argued the cause and filed a brief for appellees.*

---

*Briefs of *amici curiae* urging reversal were filed by *J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations, and by *Melvin L. Wulf* and *Joel M. Gora* for the American Civil Liberties Union.

*James Newton Wilhoit III, Rex H. Reed,* and *John L. Kilcullen* filed a brief for the National Right to Work Legal Defense Foundation as *amicus curiae* urging affirmance.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

This case involves three state libel judgments imposing liability of $165,000 on a labor union as a result of statements made in a union newsletter during a continuing organizational drive. The question presented is whether these libel judgments can be squared with the freedom of speech in labor disputes guaranteed under federal law.

## I

Appellant Old Dominion Branch No. 496 is a local union affiliated with the appellant National Association of Letter Carriers, AFL–CIO. At all times relevant to this case, the Branch was recognized by postal authorities as the exclusive local collective-bargaining representative of letter carriers in the Richmond, Virginia, area in accordance with § 10 of Executive Order No. 11491,[1] governing labor-management relations in the Executive Branch of the Federal Government. Appellees, Henry M.

---

[1] 34 Fed. Reg. 17605 (1969), 3 CFR 861 (1966–1970 Compilation), as amended, 3 CFR 254 (1974). The Executive Order was promulgated on October 29, 1969, and became effective on January 1, 1970. It remains in effect with respect to most employees in the Executive Branch today. Postal employees, however, are no longer covered by the Executive Order. The Postal Reorganization Act of 1970, 84 Stat. 719, converted the cabinet-level Post Office Department into the United States Postal Service, an "independent establishment of the executive branch," 39 U. S. C. § 201. As part of this reorganization, labor-management relations in the Postal Service were largely placed under the regulation of the National Labor Relations Act and the NLRB, effective July 1, 1971. See 39 U. S. C. §§ 1201–1209. While the Branch apparently remains the exclusive bargaining representative for letter carriers in Richmond under the Postal Reorganization Act, this case arose during the brief period when the Executive Order was controlling.

Austin, L. D. Brown, and Roy P. Ziegengeist, were letter carriers in Richmond who neither were members of the Union nor paid any dues or fees to the Union.[2]

Although it had already been selected as bargaining representative by a majority of the postal workers in the unit, the Branch in the spring of 1970 was engaged in an ongoing effort to organize the remainder of the letter carriers. As part of this campaign, the Branch periodically published in its monthly newsletter, the Carrier's Corner, a list of those who had not yet joined the Union, under the heading "List of Scabs." After his name twice appeared in the "List of Scabs," appellee Austin complained to the Richmond Postmaster and the President of the Branch that the Union was trying to coerce him into joining. Austin said that he did not know what a scab was, but that he was going to sue the Union if he was called a scab again.

Several weeks later, the June issue of the Carrier's Corner was distributed to Branch members. Once again the newsletter contained a "List of Scabs," including the names of the three appellees, as well as 12 others. Just above the list of names, the newsletter noted that "[s]ome co-workers are in a quandary as to what a scab is" and said "we submit the following." There followed

---

[2] Section 12 (c) of the Executive Order provides:

"[N]othing in the agreement [between an agency and a labor organization] shall require an employee to become or to remain a member of a labor organization, or to pay money to the organization . . . ."

The Postal Reorganization Act continues this prohibition of union security agreements, 39 U. S. C. § 1209 (c). The NLRA, of course, permits certain union security agreements, § 8 (a) (3), 61 Stat. 140, 29 U. S. C. § 158 (a) (3), except insofar as they may violate state law, § 14 (b), 29 U. S. C. § 164 (b). See *Retail Clerks* v. *Schermerhorn*, 375 U. S. 96 (1963).

a well-known piece of trade union literature, generally attributed to author Jack London, which purported to supply a definition:

"The Scab

"After God had finished the rattlesnake, the toad, and the vampire, He had some awful substance left with which He made a *scab*.

"A scab is a two-legged animal with a corkscrew soul, a water brain, a combination backbone of jelly and glue. Where others have hearts, he carries a tumor of rotten principles.

"When a scab comes down the street, men turn their backs and Angels weep in Heaven, and the Devil shuts the gates of hell to keep him out.

"No man (or woman) has a right to scab so long as there is a pool of water to drown his carcass in, or a rope long enough to hang his body with. Judas was a gentleman compared with a scab. For betraying his Master, he had character enough to hang himself. A scab has not.

"Esau sold his birthright for a mess of pottage. Judas sold his Savior for thirty pieces of silver. Benedict Arnold sold his country for a promise of a commission in the British Army. *The scab sells his birthright, country, his wife, his children and his fellowmen for an unfulfilled promise from his employer.*

*"Esau was a traitor to himself; Judas was a traitor to his God; Benedict Arnold was a traitor to his country; a SCAB is a traitor to his God, his country, his family and his class."* App. 8–9. (Emphasis supplied.)

Appellees filed these defamation actions against the Branch and the National Association shortly after the

June newsletter was published.[3] Appellants sought dismissal of the actions on the ground that the publication was protected speech under the First Amendment and under federal labor law. The trial judge recognized that this case involved the "publications of a labor union which [were] relevant to and in the course of a campaign to organize federal employees." App. 20. Nevertheless, he overruled the demurrers, interpreting this Court's decision in *Linn* v. *Plant Guard Workers*, 383 U. S. 53 (1966), to permit application of state libel laws in such circumstances as long as the statements were made with "actual malice." The judge defined "actual malice" in his instructions to the jury as follows:

> "The term 'actual malice' is that conduct which shows in fact that at the time the words were printed they were actuated by some sinister or corrupt motive such as hatred, personal spite, ill will, or desire to injure the plaintiff; or that the communication was made with such gross indifference and recklessness as to amount to a wanton or wilful disregard of the rights of the plaintiff." App. 93.

The jury returned a verdict awarding each of the appellees $10,000 in compensatory damages and $45,000 in punitive damages.[4]

---

[3] These actions are actually based on Virginia's "insulting words" statute, Va. Code Ann. § 8–630 (1957), which provides:

"All words which from their usual construction and common acceptation are construed as insults and tend to violence and breach of the peace shall be actionable."

However, the Virginia courts have held that "[a]n action for insulting words under Code, § 8–630 is treated precisely as an action for slander or libel, for words actionable *per se*" with one exception not relevant here. *Carwile* v. *Richmond Newspapers, Inc.*, 196 Va. 1, 6, 82 S. E. 2d 588, 591 (1954). See opinion below in 213 Va. 377, 381, 192 S. E. 2d 737, 740 (1972).

[4] At least one suit brought by one of the other 12 letter carriers

The Supreme Court of Virginia affirmed. 213 Va. 377, 192 S. E. 2d 737 (1972). In view of appellants' substantial claims that their statements in the newsletter were protected expression under the First Amendment and federal labor law, and that the state courts had erred in interpreting the pre-emptive effect of *Linn,* we noted probable jurisdiction and set this case for oral argument with No. 72–617, *Gertz* v. *Robert Welch, Inc., post,* p. 323. 412 U. S. 917 (1973). We reverse.

## II

As noted, this case calls upon us to determine the extent to which state libel laws may be applied to penalize statements made in the course of labor disputes without undermining the freedom of speech which has long been a basic tenet of federal labor policy. We do not approach this problem, however, with a clean slate. The Court has already performed the difficult task of reconciling the competing state and federal interests involved in this area, and established the framework for our analysis here, in *Linn* v. *Plant Guard Workers, supra.*

In *Linn,* an assistant general manager of Pinkerton's Detective Agency brought suit under state libel laws against the Plant Guard Workers in a diversity action in federal court. Linn alleged that statements made in a union leaflet during a campaign to organize the company's employees, which charged him with "lying" to the employees and "robbing" them of pay increases, were false and defamatory. The District Court dismissed the complaint on the ground that the National Labor Relations Board had exclusive jurisdiction over the subject

whose names were listed in the June newsletter has been held in abeyance pending the outcome of this appeal. The potential damages liability growing out of this publication is thus greater even than the $165,000 which has already been awarded.

matter of the complaint, finding that the union's conduct would arguably be an unfair labor practice under § 8 (b) of the National Labor Relations Act, as amended, 29 U. S. C. § 158 (b), and that the Court's decision in *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959), therefore compelled dismissal on pre-emption grounds.   The Court of Appeals affirmed.

A bare majority of this Court disagreed, however, and held that the NLRA did not completely pre-empt the application of state laws to libels published during labor disputes.   The Court found that the exercise of state jurisdiction over such defamation actions would be a "merely peripheral concern" of the federal labor laws, within the meaning of *Garmon,* as long as appropriate substantive limitations were imposed to insure that the freedom of speech guaranteed by federal law was protected.   Further, the Court recognized an " 'overriding state interest' in protecting [state] residents from malicious libels."   383 U. S., at 61.   Mr. Justice Clark, writing the opinion for the Court, also pointed out that application of state law to libels occurring during labor disputes would not significantly interfere with the NLRB's role in considering arguable contemporaneous violations of the Act.   As he observed, the Board has different substantive interests from state libel law, being concerned with the coercive or misleading nature of the statements, rather than their defamatory quality.   And the NLRA and state laws provide quite different remedies: only state law can provide damages to compensate the libel victim; only the NLRB can order a new representation election if the libel is found to have substantially affected the outcome of an election.

On the other hand, the Court recognized the danger that unrestricted libel actions under state law could

easily interfere with federal labor policy. The Court observed:

"Labor disputes are ordinarily heated affairs; the language that is commonplace there might well be deemed actionable *per se* in some state jurisdictions. Indeed, representation campaigns are frequently characterized by bitter and extreme charges, counter-charges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions. Both labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language." 383 U. S., at 58.

This freewheeling use of the written and spoken word, we found, has been expressly fostered by Congress and approved by the NLRB. Thus, Mr. Justice Clark acknowledged that there was "a congressional intent to encourage free debate on issues dividing labor and management," *id.*, at 62, and noted that "the Board has given frequent consideration to the type of statements circulated during labor controversies, and . . . it has allowed wide latitude to the competing parties." *Id.*, at 60.

The Court therefore found it necessary to impose substantive restrictions on the state libel laws to be applied to defamatory statements in labor disputes in order to prevent "unwarranted intrusion upon free discussion envisioned by the Act." *Id.*, at 65. The Court looked to the NLRB's decisions, and found that "although the Board tolerates intemperate, abusive and inaccurate statements made by the union during attempts to organize employees, it does not interpret the Act as giving either party license to injure the other intentionally by circulating defamatory or insulting material known to be false." *Id.*, at 61. The Court therefore found it appropriate to adopt by analogy the standards of *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964). Accord-

ingly, we held that libel actions under state law were pre-empted by the federal labor laws to the extent that the State sought to make actionable defamatory statements in labor disputes which were published without knowledge of their falsity or reckless disregard for the truth.

## III

In this case, of course, the relevant federal law is Executive Order No. 11491 rather than the NLRA. Nevertheless, we think that the same federal policies favoring uninhibited, robust, and wide-open debate in labor disputes are applicable here, and that the same accommodation of conflicting federal and state interests necessarily follows.[5]

The basic provisions of the Executive Order establish a labor-management relations system for federal employ-

---

[5] The Executive Order is plainly a reasonable exercise of the President's responsibility for the efficient operation of the Executive Branch. *American Federation of Government Employees* v. *Hampton,* 77 L. R. R. M. 2977 (DC), aff'd *sub nom. Wolkomir* v. *Federal Labor Relations Council,* 79 L. R. R. M. 2634 (CADC 1971), cert. denied, 405 U. S. 920 (1972); *Manhattan-Bronx Postal Union* v. *Gronouski,* 121 U. S. App. D. C. 321, 350 F. 2d 451 (1965), cert. denied, 382 U. S. 978 (1966); cf. *CSC* v. *Letter Carriers,* 413 U. S. 548, 555 (1973). Moreover, the Executive Order finds express statutory authorization in 5 U. S. C. § 7301, which provides that "[t]he President may prescribe regulations for the conduct of employees in the executive branch." In view of the substantial federal interests in effective management of the business of the National Government and exclusive control over the conduct of federal employees, and this congressional authorization, we have no difficulty concluding that the Executive Order is valid and may create rights protected against inconsistent state laws through the Supremacy Clause. See *United States* v. *Pink,* 315 U. S. 203, 230–232 (1942); *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 635–637 (1952) (Jackson, J., concurring); *Farkas* v. *Texas Instruments, Inc.,* 375 F. 2d 629, 632 (CA5), cert. denied, 389 U. S. 977 (1967); *Farmer* v. *Philadelphia Electric Co.,* 329 F. 2d 3, 8 (CA3 1964).

ment which is remarkably similar to the scheme of the National Labor Relations Act.[6] Although several significant adjustments have been made to reflect the different structure and responsibilities of the governmental employer,[7] it is apparent that the Order adopted in large part the provisions and policies of the NLRA as its model.[8] Indeed, one of the primary purposes of the

---

[6] Section 1 of the Order grants federal employees "the right, freely and without fear of penalty or reprisal, to form, join, and assist a labor organization," as well as "to refrain from any such activity," and provides that "each employee shall be protected in the exercise of this right," much as employees in the private sector are protected by § 7 of the NLRA. Sections 19 (a) and 19 (b) of the Order define unfair labor practices of agency management and unions, respectively, which are largely taken from the prohibitions of §§ 8 (a) and 8 (b) of the NLRA. And § 10 of the Executive Order establishes a system of exclusive recognition of labor organizations chosen by a majority of the employees in an appropriate unit through representation elections by secret ballot, as under § 9 (c) (1) of the NLRA.

Primary responsibility for administration of this system is given to the Assistant Secretary of Labor for Labor-Management Relations, who largely performs the role of the NLRB in the private sector. Under § 6 (a) of the Order, he is empowered to make determinations of appropriate collective-bargaining units, to supervise the conduct of representation elections, and to decide complaints alleging unfair labor practices. Upon a finding of a violation of the Order, § 6 (b) empowers the Assistant Secretary to order Government agencies or unions to cease and desist from violations of the Order, and to take appropriate affirmative action. Appeals from decisions of the Assistant Secretary are heard by the Federal Labor Relations Council, established under § 4 of the Order, which is also given a significant policymaking function.

[7] Most notable among the departures from the NLRA are the prohibition of strikes and picketing in § 19 (b) (4) of the Executive Order and the limitation of subjects of bargaining in § 11 (b). See generally Hampton, Federal Labor-Management Relations: A Program in Evolution, 21 Cath. U. L. Rev. 493 (1972).

[8] See Naumoff, Ground Rules for Recognition under Executive Order 11491, 22 Lab. L. J. 100 (1970); cf. Hart, Government

Executive Order was to "substantially strengthen the Federal labor relations system by bringing it more into line with practices in the private sector of the economy." 5 Presidential Documents 1508 (Oct. 29, 1969) (announcement of the signing of Exec. Order No. 11491). Accordingly, while decisions under the NLRA may not be binding precedent under the Executive Order, the. Assistant Secretary of Labor charged with administration of the Order has held that his decisions will "take into account the experience gained in the private sector under the Labor-Management Relations Act." *Charleston Naval Shipyard,* Case Nos. 40–1940 (CA), 40–1950 (CA), A/SLMR No. 1, p. 3 (Nov. 3, 1970).

In light of this basic purpose, we see nothing in the Executive Order which indicates that it intended to restrict in any way the robust debate which has been protected under the NLRA. Such evidence as is available, rather, demonstrates that the same tolerance for union speech which has long characterized our labor relations in the private sector has been carried over under the Executive Order. For example, one of the Regional Administrators under the Executive Order program has stated, in the context of union organizing campaigns:

> "It is a cliché by now but, nonetheless, an embedded policy in labor relations that electioneering or campaigning has a broad tolerance. We do not encourage, nor do we prohibit, the exaggeration, the dissemination of half-truth or accusation. In sum, we leave it to the employee to decide." [9]

Labor's New Frontiers through Presidential Directive, 48 Va. L. Rev. 898, 904–905 (1962) (discussing Exec. Order No. 10988, predecessor of the present Order).

[9] Naumoff, *supra,* n. 8, at 103. Compare the similar language of the Board in *Stewart-Warner Corp.,* 102 N. L. R. B. 1153, 1158 (1953), quoted in *Linn* v. *Plant Guard Workers,* 383 U. S. 53, 60 (1966).

And the Assistant Secretary has held that agency censorship of union materials, even if only to delete "slanderous" or "inflammatory" material, is unlawful interference with employee rights protected under the Order and an unfair labor practice under § 19 (a)(1). *Los Angeles Air Route Traffic Control Center*, Case No. 72–CA–3014 (26), A/SLMR No. 283, App. 4 (June 30, 1973) (summarized in BNA Govt. Empl. Rel. Rep. No. 514, July 30, 1973, p. A–10).

We recognize that the Executive Order does not contain any provision corresponding to § 8 (c) of the NLRA,[10] relied on in part by the Court in *Linn*. But the Court recognized that this section was primarily intended "to prevent the Board from attributing anti-union motive to an *employer* on the basis of his past statements." 383 U. S., at 62–63, n. 5 (emphasis added). A provision corresponding to § 8 (c) was apparently thought unnecessary in the Executive Order because it directs the Government, as employer, to adopt a position of neutrality concerning unionization of its employees.[11] "Government

---

[10] Section 8 (c) provides:

"The expressing of any views, argument, or opinion, or the dissemination thereof, . . . shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit."

[11] This policy of agency neutrality is derived from two parts of the Executive Order. The preamble of the Order recites that

"the well-being of employees and efficient administration of the Government are benefited by providing employees an opportunity to participate in the formulation and implementation of personnel policies and practices affecting the conditions of their employment."

And § 1 (a) directs the head of each agency to

"take the action required to assure that employees in the agency are apprised of their rights under this section and that no interference, restraint, coercion, or discrimination is practiced within

officials do not mount 'vote no' campaigns." Hampton, Federal Labor-Management Relations: A Program in Evolution, 21 Cath. U. L. Rev. 493, 502 (1972).

The primary source of protection for *union* freedom of speech under the NLRA, however, particularly in an organizational context, is the guarantee in § 7 of the Act of the employees' rights "to form, join, or assist labor organizations." [12]

> "Basic to the right guaranteed to employees in § 7 to form, join or assist labor organizations, is the right to engage in concerted activities to persuade other employees to join for their mutual aid and protection. Indeed, even before the Norris-LaGuardia Act and the Wagner Act, this Court recognized a right in unions to 'use all lawful propaganda to enlarge their membership.' " *NLRB* v. *Drivers Local 639,* 362 U. S. 274, 279 (1960) (citations omitted).

Vigorous exercise of this right "to persuade other employees to join" must not be stifled by the threat of liability for the overenthusiastic use of rhetoric or the innocent mistake of fact. Thus, the Board has concluded that statements of fact or opinion relevant to a union organizing campaign are

his agency to encourage or discourage membership in a labor organization."

See Hampton, *supra,* n. 7, at 501–502.

[12] In other contexts, other provisions of the NLRA may be sources of protection for union freedom of speech. For example, one such source would be the system of representation elections by secret ballot established by § 9 (c) (1) of the Act. Wide latitude for what is written and said in election campaigns is necessary to insure the free exchange of information and opinions, and thus to promote the informed choice by the employees needed to make the system work fairly and effectively. The same policy is applicable under the Executive Order, which establishes in § 10 a similar system of representation elections for federal employees.

protected by § 7, even if they are defamatory and prove to be erroneous, unless made with knowledge of their falsity. See, *e. g., Atlantic Towing Co.*, 75 N. L. R. B. 1169, 1171–1173 (1948). The Court in *Linn* recognized the importance of this § 7 protection, in words quite pertinent to this case:

> "Likewise, in a number of cases, the Board has concluded that epithets such as 'scab,' 'unfair,' and 'liar' are commonplace in these struggles and not so indefensible as to remove them from the protection of § 7, even though the statements are erroneous and defame one of the parties to the dispute." 383 U. S., at 60–61.

These considerations are equally applicable under the Executive Order. Section 1 of the Order guarantees federal employees these same rights.[13]

Section 7 of the NLRA and § 1 of the Executive Order also dispose of appellees' suggestion that no "labor dispute" within the meaning of *Linn* is presented on the facts of this case. It is true, as appellees point out, that there was no dispute between labor and management

---

[13] Section 1 of the Executive Order does not grant federal employees the right, guaranteed by § 7 of the NLRA for employees in the private sector, "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." The right to attempt to persuade others to join the union, however, is derived from the rights to form, join, and assist a union, as well as from the right to engage in concerted activities. The absence of mention of a right to engage in concerted activities is obviously no more than a reflection of the fact that the Order does not permit federal employee unions to engage in strikes or picketing. The prohibition of picketing and the lack of protection for concerted activities might be thought to indicate an intention in the Executive Order to regulate the location or form of employee speech to a somewhat greater extent than under the NLRA, but we do not perceive any intention to curtail in any way the *content* of union speech.

involved here, and that the union's organizing efforts were neither during the course of a representation election campaign nor directed toward achieving recognition. But whether *Linn*'s partial pre-emption of state libel remedies is applicable obviously cannot depend on some abstract notion of what constitutes a "labor dispute"; rather, application of *Linn* must turn on whether the defamatory publication is made in a context where the policies of the federal labor laws leading to protection for freedom of speech are significantly implicated.

As noted, one of the primary reasons for the law's protection of union speech is to insure that union organizers are free to try peacefully to persuade other employees to join the union without inhibition or restraint. Accordingly, we think that any publication made during the course of union organizing efforts, which is arguably relevant to that organizational activity, is entitled to the protection of *Linn*. We see no reason to limit this protection to statements made during representation election campaigns. The protection of § 7 and § 1 is much broader. Indeed, *Linn* itself involved union organizing activity outside the election campaign context. We similarly reject any distinction between union organizing efforts leading to recognition and post-recognition organizing activity. Unions have a legitimate and substantial interest in continuing organizational efforts after recognition. Whether the goal is merely to strengthen or preserve the union's majority, or is to achieve 100% employee membership—a particularly substantial union concern where union security agreements are not permitted, as they are not here, see n. 2, *supra*—these organizing efforts are equally entitled to the protection of § 7 and § 1.[14]

---

[14] Appellees argue that, rather than being entitled to the protection of *Linn*, the union's organizing efforts here were unlawful

## IV

The courts below did not question the applicability of *Linn* to this case. Instead, both courts believed that *Linn* required only that the jury be instructed that it

---

attempts to "coerce" them into joining the union in violation of § 19 (b)(1) of the Order. But we would expect § 19 (b)(1) to be interpreted in light of the construction the Court has given the parallel provision of the NLRA, § 8 (b)(1)(A). In *NLRB* v. *Drivers Local 639,* 362 U. S. 274 (1960), the Court held that § 8 (b)(1)(A) was "a grant of power to the Board limited to authority to proceed against union tactics involving violence, intimidation, and reprisal or threats thereof." *Id.,* at 290. MR. JUSTICE BRENNAN emphasized that there was no intention to restrict the use by unions of methods of peaceful persuasion, quoting Senator Taft's remarks during the debate on the Taft-Hartley Act:

"It seems to me very clear that so long as a union-organizing drive is conducted by persuasion, by propaganda, so long as it has every legitimate purpose, the Board cannot in any way interfere with it. . . .

"The Board may say, 'You can persuade them; you can put up signs; you can conduct any form of propaganda you want to in order to persuade them, but you cannot, by threat of force or threat of economic reprisal, prevent them from exercising their right to work.'" *Id.,* at 287–288.

It is true that the Executive Order provides that a union may not "interfere with" an employee in the exercise of his right to refrain from joining the union, as well as incorporating the wording of the NLRA making it unlawful to "restrain" or "coerce" an employee. The Court in *Drivers Local 639* pointed out, however, that even the words "interfere with," which originally appeared in a draft of the Taft-Hartley Act, were intended to have a "limited application" and to reach "reprehensible practices" like violence and threats of loss of employment, but not methods of peaceful persuasion. *Id.,* at 286. It seems likely that the Executive Order was similarly not intended to limit union propaganda or prohibit any other method of peaceful persuasion.

In any event, appellees' contention is properly addressed to the Assistant Secretary in the first instance, through an unfair labor practice complaint, and not to this Court. Even if appellees should

must find the defamatory statements to have been made with malice before it could impose liability. And both courts thought that instructions which defined malice in the common-law sense—as "hatred, personal spite, ill will, or desire to injure"—were adequate under *Linn.*

This reflects a fundamental misunderstanding of the Court's holding in *Linn.* The *Linn* Court explicitly adopted the standards of *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), and the heart of the *New York Times* test is the requirement that recovery can be permitted only if the defamatory publication was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.,* at 280. The adoption in *Linn* of the reckless-or-knowing falsehood test was reiterated time and again in the Court's opinion. See 383 U. S., at 61, 63, 65.

Of course, the Court also said that recovery would be permitted if the defamatory statements were shown to have been made with malice. But the Court was obviously using "malice" in the special sense it was used in *New York Times*—as a shorthand expression of the "knowledge of falsity or reckless disregard of the truth" standard. See *New York Times Co.* v. *Sullivan, supra,* at 279–280. Instructions which permit a jury to impose liability on the basis of the defendant's hatred, spite, ill will, or desire to injure are "clearly impermissible." *Beckley Newspapers Corp.* v. *Hanks,* 389 U. S. 81, 82 (1967). "[I]ll will toward the plaintiff, or bad motives, are not elements of the *New York Times* standard." *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29, 52 n. 18 (1971) (opinion of BRENNAN, J.). Accord, *Gar-*

---

ultimately prove to be correct, *Linn* is still applicable here, and state libel remedies are pre-empted unless appellees can show that the publication was knowingly false or made with reckless disregard for the truth.

*rison* v. *Louisiana,* 379 U. S. 64, 73–74, 77–79 (1964); *Henry* v. *Collins,* 380 U. S. 356 (1965); *Rosenblatt* v. *Baer,* 383 U. S. 75, 84 (1966); *Greenbelt Cooperative Publishing Assn.* v. *Bresler,* 398 U. S. 6, 9–11 (1970). It is therefore clear that the libel judgments in this case must be reversed because of the court's erroneous instructions.

This, however, cannot be the end of our inquiry. The Court has often recognized that in cases involving free expression we have the obligation, not only to formulate principles capable of general application, but also to review the facts to insure that the speech involved is not protected under federal law. *New York Times Co.* v. *Sullivan, supra,* at 284–285; *Pickering* v. *Board of Education,* 391 U. S. 563, 574–575 (1968); *Greenbelt Cooperative Publishing Assn.* v. *Bresler, supra,* at 11. "We must 'make an independent examination of the whole record,' *Edwards* v. *South Carolina,* 372 U. S. 229, 235, so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." *New York Times Co.* v. *Sullivan, supra,* at 285.

While this duty has been most often recognized in the context of claims that the expression involved was entitled to First Amendment protection, the same obligation exists in cases involving speech claimed to be protected under the federal labor laws. This obligation, derived from the supremacy of federal labor law over inconsistent state regulation, *Hill* v. *Florida ex rel. Watson,* 325 U. S. 538 (1945); *Teamsters Local 24* v. *Oliver,* 358 U. S. 283, 295–296 (1959), requires us to determine whether any state libel award arising out of the publication of the union newsletter involved here would be inconsistent with the protection for freedom of speech in labor disputes recognized in *Linn.*

It should be clear that the newsletter's use of the epithet "scab" was protected under federal law and can-

not be the basis of a state libel judgment. Rather than being a reckless or knowing falsehood, naming the appellees as scabs was literally and factually true. One of the generally accepted definitions of "scab" is "one who refuses to join a union," Webster's Third New International Dictionary (unabridged ed. 1961), and it is undisputed that the appellees had in fact refused to join the Branch. To be sure, the word is most often used as an insult or epithet. But *Linn* recognized that federal law gives a union license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point. Indeed, the Court observed that use of this particular epithet is common parlance in labor disputes and has specifically been held to be entitled to the protection of § 7 of the NLRA. 383 U. S., at 60–61.

Appellees nonetheless argue that the publication here may be actionable under state law, basing their claim on the newsletter's publication of Jack London's "definition of a scab." Appellees contend that this can be read to charge them with having "rotten principles," with lacking "character," and with being "traitor[s]"; that these charges are untrue; and that appellants knew they were untrue. The Supreme Court of Virginia upheld the damages awards here on the basis of these charges. 213 Va., at 384, 192 S. E. 2d, at 742.

We cannot agree. We believe that publication of Jack London's rhetoric is equally entitled to the protection of the federal labor laws.[15] The *sine qua non* of recovery for defamation in a labor dispute under *Linn* is the existence of falsehood. Mr. Justice Clark put it

---

[15] In view of our conclusion that the publication here was protected under the federal labor laws, we have no occasion to consider the First Amendment arguments advanced by appellants.

quite bluntly: "the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth." 383 U. S., at 63. Before the test of reckless or knowing falsity can be met, there must be a false statement of fact. *Gertz* v. *Robert Welch, Inc., post,* at 339–340. But, in our view, the only factual statement in the disputed publication is the claim that appellees were scabs, that is, that they had refused to join the union.

The definition's use of words like "traitor" cannot be construed as representations of fact. As the Court said long before *Linn,* in reversing a state court injunction of union picketing, "to use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies—like 'unfair' or 'fascist'—is not to falsify facts." *Cafeteria Employees Local 302* v. *Angelos,* 320 U. S. 293, 295 (1943). Such words were obviously used here in a loose, figurative sense to demonstrate the union's strong disagreement with the views of those workers who oppose unionization. Expression of such an opinion, even in the most pejorative terms, is protected under federal labor law. Here, too, "there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz* v. *Robert Welch, Inc., post,* at 339–340.

Appellees' claim is similar to that rejected by the Court recently in *Greenbelt Cooperative Publishing Assn.* v. *Bresler,* 398 U. S. 6 (1970). There, petitioners had characterized the position of the respondent, a public figure, in certain negotiations as "blackmail," and he had recovered damages for libel on the theory that petitioners knew that he had committed no such criminal offense. The Court reversed, holding that this use of the word "blackmail" could not be the basis of a libel judgment

under the *New York Times* standard. MR. JUSTICE STEWART, writing for the Court, reasoned:

"It is simply impossible to believe that a reader who reached the word 'blackmail' in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable." 398 U. S., at 14 (footnote omitted).

It is similarly impossible to believe that any reader of the Carrier's Corner would have understood the newsletter to be charging the appellees with committing the criminal offense of treason.[16] As in *Bresler*, Jack Lon-

---

[16] On the contrary, it is apparent from the record that the basis for the libel action in this case was the use of the epithet "scab" rather than the claimed charge of treason. It was the publication of the "List of Scabs" which disturbed the appellees, and which moved appellee Austin to complain prior to the June publication at issue and to threaten to sue if he was called a scab again. Moreover, it appears that the only asserted damage to appellees followed from the publication of the fact that they were "scabs." Appellees testified only that their coworkers and others became hostile to them, referring to them as the "scabs" the union was talking about, and that this made them tense and nervous and caused headaches. There is no evidence that anyone took literally the use of the word "traitor" or that appellees were in any way concerned about or affected by this charge.

Nor can it be claimed that the jury's verdict is itself some indication that the charge of "traitor" was construed as a defama-

don's "definition of a scab" is merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members towards those who refuse to join. The Court in *Linn* recognized that such exaggerated rhetoric was commonplace in labor disputes and protected by federal law. Indeed, we note that the NLRB has held that the use of this very "definition of a scab" is permissible under federal law. *Cambria Clay Products Co.*, 106 N. L. R. B. 267, 273 (1953), enforced in pertinent part, 215 F. 2d 48 (CA6 1954). It has become a familiar piece of trade union literature; according to undisputed testimony in this case, it has been published countless times in union publications over the last 30 years or more. Permitting state libel judgments based on publication of this piece of literature would be plainly inconsistent with the union's justifiable reliance on the protection of federal law.

This is not to say that there might not be situations where the use of this writing or other similar rhetoric in a labor dispute could be actionable, particularly if some of its words were taken out of context and used in such a way as to convey a false representation of fact. See *Greenbelt Cooperative Publishing Assn.* v. *Bresler, supra,* at 13. But in the context of this case, no such factual representation can reasonably be inferred, and

---

tory representation of fact. There is certainly nothing in the trial court's instructions which would suggest that the newsletter's use of "scab" was not the basis for the jury's verdict. The court did not instruct the jury that the use of "scab" could not be the basis for imposing liability. The court did not even instruct the jury that a true statement of fact could not be the foundation for liability. Indeed, the trial court's instruction that "insults" made with "ill will" were sufficient to impose liability fairly invited the jury to base its verdict on the newsletter's use of "scab."

the publication is protected under the federal labor laws.[17] Accordingly, the judgments appealed from must be

*Reversed.*

MR. JUSTICE DOUGLAS, concurring in the result.

As the Court states, this case calls upon us to determine the extent to which state libel laws may be used to penalize statements expressed in the course of a labor dispute. In this instance Virginia's libel laws were used to impose massive damages[1] upon a labor union for publicly expressing, during the heat of an organizational drive, its highly pejorative but not too surprising opinion of "scabs." I agree that this expression is protected and that the judgments below cannot stand. Unlike the Court, however, I do not view the task of reconciling the competing state and federal interests in this area as a difficult one, nor do I view the federal interest as merely a matter of federal labor policy. I think that such expression is constitutionally protected and I cannot agree that there might be situations "where the use of

---

[17] Since we find that any libel award on the basis of this publication would be inconsistent with the protection of federal law, we need not rule on appellants' alternative argument that the damages awarded here were excessive. We think it important again to point out, however, that "in view of the propensity of juries to award excessive damages for defamation, the availability of libel actions may pose a threat to the stability of labor unions and smaller employers." *Linn*, 383 U. S., at 64. It is for this reason that the Court in *Linn* held that "[i]f the amount of damages awarded is excessive, it is the *duty* of the trial judge to require a remittitur or a new trial." *Id.*, at 65–66 (emphasis added).

[1] The judgments in this case awarded damages of $165,000 but the total figure might be larger since at least one other suit arising out of the same publication has been held in abeyance pending the outcome of this appeal.

this writing or other similar rhetoric in a labor dispute could be actionable."

I agree with the Court that federal labor policy, as manifested both in the NLRA and in Executive Order 11491, favors uninhibited, robust and wide open debate in labor disputes. I disagree with the Court, however, on the reach of that policy. I think that the pre-emptive effect of federal labor regulation is such that States are prohibited from interfering with those federally regulated relations by arming disputants in labor controversies with an arsenal of defamation laws. See *Linn* v. *Plant Guard Workers,* 383 U. S. 53, 69 (Fortas, J., dissenting). Though referring to this state of affairs as federal labor policy, I expressly reject any implication that the policy could be otherwise were Congress or the Executive to reassess the underlying considerations and attempt to reformulate the policy.

We said in *Thornhill* v. *Alabama,* 310 U. S. 88, 102, that, "[i]n the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution." [2] Since I do

---

[2] The view has been expressed that the First Amendment should accord protection only to explicitly political speech. See Bork, Neutral Principles and Some First Amendment Problems, 47 Ind. L. J. 1, 20 (1971). Decisions such as *Thornhill,* however, reject any such emasculative reading of the First Amendment. As Mr. Justice Black has said: "There is nothing in the language of the First Amendment to indicate that it protects only *political* speech, although to provide such protection was no doubt a strong reason for the Amendment's passage." H. Black, A Constitutional Faith 46 (1969). The importance of free discussion in all areas was well perceived in this country before our constitutional scheme was formulated. In a letter sent to the inhabitants of Quebec in 1774, the Continental Congress spoke of "five great rights," stating in part: "The last right we shall mention, regards the freedom of the press. The importance of this consists, *besides the advancement of*

not think that discussion is free in the constitutional sense when it subjects the speaker to the penalty of libel judgments, in my view the ability of Congress or the Executive to formulate any labor policy penalizing those who might "say naughty things during labor disputes" [3] is precisely nil. I believe the Framers did all the policy-making necessary in this area when they devised the constitutional framework which binds us all. As I stated in *Gertz* v. *Robert Welch, Inc., post,* at 356–357, the First Amendment would prohibit Congress from passing any libel law [4] and the limitation on labor policy formulation is but an example of the general restriction.

If the States were not limited to the same extent as the Federal Government in restraining discussion, the pre-emptive effect of federal labor regulations would be crucial. But I have always thought that the application of the First Amendment to the States through the Fourteenth [5] leaves the States as constitutionally impo-

---

*truth, science, morality, and arts in general,* in its diffusion of liberal sentiments on the administration of Government . . . ." 1 Journals of the Continental Congress 1774–1789, p. 108 (Ford ed. 1904) (emphasis added).

[3] See *Linn* v. *Plant Guard Workers,* 383 U. S. 53, 67 (Black, J., dissenting).

[4] See also *Rosenblatt* v. *Baer,* 383 U. S. 75, 90 (concurring). In explaining the constitutional history which led him to the same conclusion, Mr. Justice Black said of the Framers: "They knew what history was behind them; they were familiar with the sad and useless tragedies of countless people who had had their tongues plucked out, their ears cut off or their hands chopped off, or even worse things done to them, because they dared to speak or write their opinions. They wanted to ordain in this country that the new central government should not tell the people what they should believe or say or publish." H. Black, A Constitutional Faith 46 (1969).

[5] See, *e. g., Stromberg* v. *California,* 283 U. S. 359, 368–369; cases compiled in *Gertz* v. *Robert Welch, Inc., post,* at 359 n. 8 (DOUGLAS, J., dissenting).

tent as the Federal Government in enforcing such restrictions. This conclusion is compelled if freedom of speech is regarded, as I think it must be, as a privilege or immunity of United States citizenship within the meaning of that term in the Fourteenth Amendment rather than some ephemeral right protected against state intrusion only to the extent a majority of this Court might view as "implicit in the concept of ordered liberty." [6] As I stated in my dissent to *Gertz* v. *Robert Welch, Inc., post,* at 358–359:

> "[T]he Court frequently has rested state free speech and free press decisions on the Fourteenth Amendment generally rather than on the Due Process Clause alone. The Fourteenth Amendment speaks not only of due process but also of 'privileges and immunities' of United States citizenship. I can conceive of no privilege or immunity with a higher claim to recognition against state abridgement than the freedoms of speech and of the press."

Since labor disputes are " 'within that area of free discussion that is guaranteed by the Constitution' " and since in my view the States and the Federal Government are equally bound to honor that guarantee, the fate of the libel award in this case is clear. "Discussion is not free . . . within the meaning of our First Amendment, if that discussion may be penalized by judgments for damages in libel actions." *Linn* v. *Plant Guard Workers,* 383 U. S., at 68 (Black, J., dissenting). The extensive damages awarded in this case well illustrate that any protection short of a complete bar to suits for defamation will be cold comfort to those who enter the arena of free discussion in labor disputes. The imaginative vituperation which is commonplace in labor strife well exceeds the "normal" levels of hyperbole to which

---

[6] See *Palko* v. *Connecticut,* 302 U. S. 319.

most members of the community may be accustomed. A jury determination in a libel suit, no matter what the standard of recovery, is as likely to be influenced by community attitudes toward unionization and the often colorful individuals involved in its promotion as by any real appreciation for the damage perceived as inflicted by any alleged falsehood.

Since I do not believe that the judgments below are consistent with either federal labor policy or with constitutionally protected free speech, I concur in their reversal.

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting.

Today the Court extends the rule of *New York Times Co. v. Sullivan,* 376 U. S. 254 (1964), to encompass every defamatory statement made in a context that falls within the majority's expansive construction of the phrase "labor dispute." Because this decision appears to allow both unions and employers to defame individual workers with little or no risk of being held accountable for doing so, I dissent.

I

Executive Order 11491 establishes for certain federal employees a legal system for labor-management relations essentially similar to that provided employees in the private sector by the National Labor Relations Act. (NLRA). The Court acknowledges that the two schemes are not identical but finds no persuasive reason to differentiate between them for the purpose of determining their pre-emptive impact on state libel law. With this much I agree.

The majority then concludes that the instant case is controlled by *Linn v. Plant Guard Workers,* 383 U. S. 53 (1966). In *Linn* the Court construed the NLRA to bar state libel judgments for defamatory statements made

in a "labor dispute" covered by the Act, unless those statements were made "with knowledge of their falsity or with reckless disregard of whether they were true or false. . . ." *Id.*, at 65. Thus the Court adopted as a rule of labor law pre-emption the constitutional standard of media liability for defamation originally enunciated for libel actions by public officials in *New York Times Co., supra,* and subsequently extended to public figures in *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130 (1967). In the instant case the majority relies on the analogy to the NLRA to support its conclusion that Executive Order 11491 pre-empts the libel judgments in favor of these appellees because liability was not premised on the knowing-or-reckless falsity standard that *Linn* held applicable to defamatory statements made in a "labor dispute." I perceive no reason in law or in public policy for such a sweeping extension of *New York Times*. *Linn* is distinguishable on its facts and in its rationale, and the *New York Times* rule of knowledge of falsity or reckless disregard for the truth is therefore inapplicable to the case at hand.

*Linn* involved a classic confrontation between union and management locked in combat during an organizational campaign. Linn was assistant general manager of Pinkerton's National Detective Agency, Inc. Pinkerton's employees were then the subject of an organizational campaign by the United Plant Guard Workers. In the course of that effort the union published a leaflet urging Pinkerton's employees to join the union and allegedly accusing Linn of "lying" to the employees and "robbing" them of pay increases. Linn sued the union for libel, but the trial court held that the National Labor Relations Board had exclusive jurisdiction over the subject matter of the dispute. It found that Linn's complaint charged the union with conduct arguably constituting an unfair labor practice under the NLRA and that

*San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959), therefore required dismissal of the suit.

This Court disagreed with that reasoning. It recognized an " 'overriding state interest' in protecting [state] residents from malicious libels . . . ," 383 U. S., at 61, and noted that federal labor law does not protect individuals against injury to reputation. Even where statements actionable as libel under state law would also constitute an unfair labor practice, the Board's interest would be limited to their coercive or misleading character, and the Board would be powerless to award damages or take any other step to redress the injury to the reputation of a defamed individual. The Court therefore held that the NLRA does not wholly pre-empt state libel law, even where the subject matter of the libel action might also constitute an unfair labor practice under the Act. Even in that circumstance, the States remain free to award damages for defamatory falsehoods published with knowledge of their falsity or in reckless disregard of the truth.

The result of *Linn* is a rule of partial pre-emption. The States may award libel judgments on the basis of the knowing-or-reckless-falsity formulation but are pre-empted from allowing defamation plaintiffs to recover under any less demanding standard of liability. The level of pre-emption is defined by *New York Times Co.* v. *Sullivan.* But the *Linn* rule of partial pre-emption has another dimension, one that distinguishes the case at hand. That is the scope of the rule—in other words, the range of circumstances in which state libel law is partially displaced by federal labor law. This is determined by the phrase "labor dispute."

In *Linn* the Court relied on the presence of a "labor dispute" to justify partial pre-emption of state libel law, but it did not delineate the boundaries of that concept. Indeed, the Court had no occasion to do so, for, as we have seen, *Linn* involved a prototypical orga-

nizational campaign confrontation between labor and management. Given that factual setting, the Court found a potential conflict between federal labor law and state libel law. One side or the other could use defamation actions as an unauthorized weapon in the battle for the loyalty of unorganized employees and possibly undermine the federal policies favoring uninhibited debate between union and management. The instant dispute is so far removed from the factual setting in *Linn* that the considerations supporting partial pre-emption of state libel law in that case simply do not obtain here.

Appellant union had long been recognized by the postal authorities as the exclusive collective-bargaining representative for the letter carriers in the Richmond area. Of a maximum of 435 letter carriers in the unit, all save 15 were active union members. Thus the union was solidly entrenched, with approximately 96% of the letter carriers signed up. The three appellees were among those 15 employees who elected not to join the union. There is no evidence of concerted action by these 15 letter carriers; they were acting individually, motivated by principle or personal conviction or perhaps, as appellant union alleges, by a desire not to pay dues. In any event, the three appellees had worked as letter carriers for 14, 13, and 12 years, respectively, without any sort of trouble either with the postal authorities or with their fellow employees. In fact, there is no evidence that the appellees were involved in a dispute with anyone until the union officials became displeased with appellees' exercise of their admitted right not to join the union and began to subject them to public ridicule and vilification.

The majority characterizes the union's actions as part of an ongoing organization campaign, *ante,* at 267, and treats this situation as a "labor dispute" within the intendment of the *Linn* rule of partial pre-emption. But

this is accurate only if federal labor law is sufficiently implicated to warrant pre-emption of state libel law whenever an employee declines an invitation to become a union member. Certainly, there was no dispute here between labor and management. There was also no conflict between competing labor organizations and no effort, either organized or otherwise, to encourage defection from appellant union. There was, in short, no dispute of any sort save the union's attempt to coerce appellees by scurrilous and defamatory statements to do what they had an admitted legal right not to do. Thus the union, *by its own coercive conduct*, created a "dispute," the presence of which, according to the majority, provides partial immunity from the consequences of its wrongdoing under state law.

In my view this is an unnecessary and unwise extension of *Linn*. Here there was no confrontation between powerful forces of labor and management, no clash of opposing economic interests that might warrant the attention of federal regulatory authorities, and hence no prospect whatever that reliance on state libel law might subvert the federal scheme for the fair and peaceful resolution of labor disputes. Yet the majority nevertheless holds that the state libel judgments entered below are pre-empted by federal labor law. This conclusion seems to me a needless denigration of the "overriding state interest" in compensating individuals for injury to reputation. Moreover, it leaves these appellees without effective remedy for the wrong done them. Far from representing a powerful economic interest that could fight for itself within the federally created system of individual self-government, these appellees were defenseless individuals.* In their "dis-

---

*The publication was sent in the union's paper to all members and also was posted on the bulletin board. Appellees had no means to reply or defend their reputations.

pute" with the union, appellees found themselves in that state of helpless inequality that first gave social meaning to the labor movement. And after today's decision, the individual employee's exposure to harm without effective remedy is not limited to defamation by a labor union, for presumably a corporate employer may also claim the knowing-or-reckless-falsity privilege as a bar to liability for defamatory statements concerning an employee's decision to join or remain in a union. I do not believe *Linn* can fairly be construed to warrant any such regressive result.

## II

As an alternative basis for its decision, the Court concludes that appellees are prohibited from recovering because there was no libel, indeed no falsehood of any kind, in the union's publication. According to the majority, the only factual allegation contained in the article was that appellees were "scabs," as that term is used in the labor movement, and that "naming the appellees as scabs was literally and factually true." *Ante,* at 283. It is true, of course, that appellees were identified by name as "scabs" in the union newsletter, but it is also true that the use of the word "scab" was explicated by a long and vituperative article appearing immediately above appellees' names. The only fair way to read this article is to substitute each appellee's name for the word "scab" whenever it appears. So construed, the plain meaning and import of this publication was that appellees lacked character, that they had "rotten principles," and that they were traitors to their God, their country, their families, and their friends. Appellants make no attempt to prove the truth of these accusations, contending instead that they were mere hyperbole involving no statement of fact. The majority accepts this argument, in my view erroneously.

It seems to me that the majority fails to distinguish between defamatory references to an anonymous group, class, or occupation, and a similar description of a named individual. It is one thing to say that lawyers are shysters and that doctors are quacks, but it is quite another matter—indeed, it is libelous *per se*—to publish that lawyer Jones is a shyster or that Dr. Smith is a quack. Here the union did not merely voice its opinion of "scabs" generally; it identified these appellees by name and specifically impugned their character.

I would hold that federal law does not prohibit appellees from recovering from appellant union for injury to reputation. I would reverse and remand for a new trial in accord with our decision in *Gertz* v. *Robert Welch, Inc., post,* p. 323.