MILLETT, Circuit Judge,
concurring:
As the opinion explains, our deferential standard of review and the record in this case support the conclusion that Eric Williamson’s offensive, but fleeting and isolated, obscene gesture did not amount to striker misconduct so egregious that it forfeited the protection of the National Labor Relations Act.
I write separately, though, to convey my substantial concern with the too-often cavalier and enabling approach that the Board’s decisions have taken toward the sexually and racially demeaning misconduct of some employees during strikes. Those decisions have repeatedly given refuge to conduct that is not only intolerable by any standard of decency, but also illegal in every other corner of the workplace. The sexually and racially disparaging con *21 duct that Board decisions have winked away encapsulates the very types of demeaning and degrading messages that for too much of our history have trapped women and minorities in a second-class workplace status.
While the law properly understands that rough words and strong feelings can arise in the tense and acrimonious world of workplace strikes, targeting others for sexual or racial degradation is categorically different. Conduct that is designed to humiliate and intimidate another individual because of and in terms of that person’s gender or race should be -.unacceptable in the work environment. Full stop.
. Yet time and again the Board’s decisions have given short shrift to gender-targeted behavior, the message of which is calculated to be sexually derogatory and demeaning. According to Board precedent, such conduct was supposedly not extreme enough to constitute a “threat.” For; example, in Calliope Designs, 297 NLRB 510 (1989), the Board ruled that a striker calling a non-striker a “whore” and a “prostitute,” and adding that she was “having sex with [the employer’s] president,” was not “serious misconduct” and thus was not sanctionable, id. at 521. That same striker repeatedly called a second female employee “a ‘whore’ and told [her] she could earn more money by selling her daughter, another nonstriker, at the flea market.” Id. Completely protected, the Board decision said.
Similarly, in Gloversville Embossing Corp., 297 NLRB 182 (1989), the Board’s ruling deemed it acceptable for a striker to yell at female non-strikers to come- see “a real man” and then to “pull[] down his pants and expose[] himself,” id. at 193-194. And in Robbins Company, 233 NLRB 549 (1977), the Board’s order required the reinstatement of a striker who “made crude and obscene remarks and suggestions regarding sex, including an invitation to ‘make some extra money at his apartment that night’” to a female employee, id. at 557. See also Nickell Moulding, 317 NLRB 826, 828 (1995), enforcement denied, NMC Finishing v. NLRB, 101 F.3d 528, 532 (8th Cir. 1996) (reinstating striker who targeted a non-striker by carrying on the picket line a homemade sign reading “Who is Rhonda F [with an X through F] Sucking Today?”).
The Board’s rulings have been equally unmoved by racially derogatory and demeaning epithets and behavior. See, e.g., Airo Die Casting, Inc., 347 NLRB 810, 811-812 (2006) (protecting a striker who raised both middle fingers and shouted “fuck you nigger” at an African-American security guard); Cooper Tire & Rubber Co. and United Steel, Paper and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union, 363 NLRB No. 194 (2016) (requiring reinstatement of picketer who called out: “Did you bring enough KFC for everybody?” and “Hey, anybody smell that?! smell fried chicken and watermelon,” in reference to African-American replacement workers).
Nothing in the Board’s decisions has offered any plausible justification, and I can conceive .of none, for concluding that the rights, of workers — all workers — are protected by turning picket lines into free zones for sexually or racially abusive and demeaning conduct. Instead, the Board’s rulings dismiss such abhorrent behavior as “unpleasantries” that are just part and •parcel of the contentious environment and heated language that ordinarily accompany strike activity. Gloversville, 297 NLRB at 194 (“[Njonstriking employees and replacement workers must be prepared to contend with some unpleasantries in a strike situation. * * * .[The striker’s] conduct, while censurable, is within the *22 bounds of permissible picket line misconduct[.]”); see also Airo Die Casting, Inc., 347 NLRB at 812 (“[The striker’s] conduct on the picket line, the use of obscene language and gestures and a racial slur, standing alone without any threats or violence, did -not rise to the level where he forfeited the protection of the Act.”); Polynesian Hospitality Tours, 297 NLRB 228, 252 (1989) (“While one can sympathize with [the female manager] because of the rudeness and vulgarity demonstrated toward her, * * * [none of the activity] ever reached the level that it would * * * even come close to removing an employee from the protection of the Act * * * [since no misconduct] went beyond the use of epithets, vulgar words, profanity, vulgar gestures, and the like.”).
There is no question that Emily Post rules do not apply to a strike. “[S]ome types of impulsive behavior must have been within the contemplation of Congress when it provided for the right to strike.” Allied Indus. Workers, AFL-CIO Local Union No. 289, 476 F.2d 868, 879 (D.C. Cir. 1973). Accordingly, when looking at the “rough and tumble of an economic strike,” NMC Finishing v. NLRB, 101 F.3d 528, 531 (8th Cir. 1996), the Board can quite appropriately make allowance for “a trivial rough incident,” Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc., 312 U.S. 287, 293, 61 S.Ct. 552, 85 L.Ed. 836 (1941), and can certainly leave room for the “normal outgrowths of the intense feelings developed on picket lines,” NLRB v. Wichita Television Corp., 277 F.2d 579, 585 (10th Cir. 1960). See also Old Dominion Branch No. 496, Nat’l Ass’n of Letter Carriers v. Austin, 418 U.S. 264, 272-273, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (noting that federal labor policies “favor[] uninhibited, robust, and wide-open debate in labor disputes,” and that “freewheeling use :of the written and spoken word * * * has been expressly fostered by Congress and approved by the [Board]”); id. at 283, 94 S.Ct. 2770 (“Federal law gives a union license to use intemperate, abusive, or insulting language without fear of-restraint or penalty if it believes such rhetoric to be an effective means to make its point”).
So giving strikers a pass on zealous expressions of frustration and discontent makes sense. Heated words and insults? Understandable. Rowdy and raucous behavior? Sure, within lawful bounds. But conduct of a sexually or racially demeaning and degrading nature is categorically different. Calling a female co-worker a “whore” or exposing one’s genitals to her is not even remotely a “normal outgrowth ]” of strike-related emotions. In what possible way does propositioning her for sex advance any legitimate strike-related message? And how on earth can calling an African-American worker “nigger” be a tolerated mode of communicating worker grievances?
Such language and behavior have nothing to do with attempted persuasion about the striker’s cause. Nor do they convey any message about workplace injustices suffered, wrongs inflicted, employer mistreatment, managerial indifference, the causes of employee frustration and anger, or anything at all of relevance about working conditions or worker complaints. Indeed, such behavior is flatly forbidden in every other corner of the workplace because it is dangerously wrong and breathes new life into economically suffocating and dehumanizing discrimination that we have labored for generations to eliminate. Brushing that same behavior off when it occurs during a strike simply legitimates the entirely illegitimate, and it signals that, when push comes to shove, discriminatory and degrading stereotypes can still be a legitimate weapon in economic disputes.
*23 Tellingly (and thankfully), it seems to be an isolated few who undertake such abusive behavior. The overwhelming majority of those involved in strikes are able to effectively communicate their grievances and viewpoints without resort to racial- or gender-based attacks. That just proves that there is no legitimate communicative or organizational role for such misconduct.
And by the way, the Board is supposed to protect the rights of all employees covered by the Act. See Rights We Prated, National Labor Relations Board, https:// www.nlrb.gov/rights-we-protect (last visited Aug. 17, 2016) (“The National Labor Relations Board protects the rights of most private-sector employees to join together, with or without a union, to improve their wages and working conditions.”). Holding that such toxic behavior is a routine part of strikes signals to women and minorities both in the union and out that they are still not truly equals in the workplace or union hall. For when the most important labor/management battles arise and when the economic livelihood of the employer and the employees is on the line, the Board’s decisions say that racial and misogynistic epithets, degrading-behavior, and race- and gender-based vilification are once again fair game.
We have cautioned the Board before against assuming that “the use of abusive language, vulgar expletives, and racial epithets” between employees “is part and parcel of the vigorous exchange that often accompanies labor relations.” Adtranz ABB Daimler-Benz Transp., N.A., Inc. v. NLRB, 253 F.3d 19, 24 (D.C. Cir. 2001) (internal quotation marks omitted). It is both “preposterous” and insulting to ensconce into labor law the assumption that “employees are incapable of organizing a union or exercising their other statutory rights under the National Labor Relations Act without resort to abusive or threatening language” targeted at a person’s gender or race. Id. at 26; see also id. (expressing concern about a Board decision indicating that “it is perfectly acceptable to use the most offensive and derogatory racial or sexual epithets, so long as those using such language are engaged in union organizing or efforts to vindicate protected labor activity”).
In this case, the Board also reasoned that crptch-grabbing must be condoned because it was not a threat to the female employee that Williamson targeted. Maybe not in this instance given the absence of record evidence documenting an adverse effect on Walters. But the problem is that the Board’s decisions seem in too many cases to answer that question from the perpetrator’s perspective, oblivious to the dark history such words and actions have had in the workplace (and elsewhere). See, e.g., Airo Die Casting, Inc., 347 NLRB at 812 (finding testimony from management officials about the reaction of a security guard targeted with a racial slur — “visibly shaken and offended” — to be “somewhat exaggerated” because “anyone examining the actual [video] recording of [the striker’s] activity would be hard pressed to see any threatening or aggressive conduct”); Polynesian Hospitality Tours, 297 NLRB at 252 (“[W]hile * * * one must concede that employees’ conduct was somewhat rude and vulgar, it seems scarcely surprising * * * that some of them became angry at [the manager], referred to her as a ‘bitch,’ and that some of them yelled that she should be fired[.] * * * [T]he actions of the employees in this case [are] valid protests of a supervisor’s illegal actions against them.”); Cooper Tire & Rubber Co., 363 NLRB No. 194 (finding that, “even though [the picketer’s] statements were offensive and racist, and certainly may have been disrespectful to the dignity and feelings of African-American replacement workers, there is no evidence to es *24 tablish that the statements contained overt or implied threats; that they coerced or intimidated employees in the exercise of their rights protected under the Act, or that they raised a reasonable likelihood of an imminent physical confrontation”).
Nor do the Board’s decisions grapple with the enduring effects in the workplace of such noxious language and behavior. The assumption that such gender- and race-based attacks can be contained to the picket line blinks reality. It will often be quite hard for a woman or minority who has been on the receiving end of a spew of gender or racial epithets — who has seen the darkest thoughts of a co-worker revealed in a deliberately humiliating tirade — to feel truly equal or safe working alongside that employee again. Racism and sexism in the workplace is a poison, thé effects of which can continue long after the specific action ends. Cf. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (“‘One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional psychological stability of minority group workers[.]’”) (quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971), cert. denied, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)); Harris v. Forklift Sys., 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (“A discriminatorily abusive work environment, even one that does not seriously affect employees’ psychological well-being, can and often will detract from employees’ job performance, discourage employees from remaining on the job, or keep them from advancing their careers.’’).
Accordingly, if the Board’s decisions insist on letting the camel’s nose of racial and gender discrimination into the work environment, the Board should also think long and hard about measuring the “threats” associated with such sexually or racially degrading behavior from the perspective of a reasonable person in the target’s position, and how nigh impossible it is to cabin racism’s and sexism’s pernicious effects. Cf. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (Under Title VII, “the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiffs position, considering ‘all the circumstances.’ ”) (quoting Harris, 510 U.S. at 23, 114 S.Ct. 367).
To be sure, employees’ exercise of their statutory rights to oppose employer practices must be vigorously protected, and ample room must be left for powerful and passionate expressions of views in the heated context of a strike. But Board decisions’ repeated forbearance of sexually and racially degrading conduct in service of that admirable goal goes too far. After all, the Board is a component of the same United States Government that has fought for decades to root discrimination out of the workplace. Subjecting co-workers and others to abusive treatment that is targeted to their gender, race, or ethnicity is not and should not be a natural byproduct of contentious labor disputes, and it certainly should not be accepted by an arm of the federal government. It is 2016, and .“boys will be boys” should be just as forbidden on the picket line as it is on the assembly line.