**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, LOCAL 2031, Petitioner,**

**v.**

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent, Veterans Administration, Washington, D.C., et al., Intervenors.**

**No. 87–1199.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 17, 1988.

Decided June 27, 1989.

---

Charles A. Hobbie, Washington, D.C., with whom Mark D. Roth was on the brief, for petitioner.

William R. Tobey, Atty., Federal Labor Relations Authority, with whom Ruth E. Peters, Solicitor, William E. Persina, Deputy Sol., and Arthur A. Horowitz, Associate Sol., Federal Labor Relations Authority, were on the brief, for respondent. Robert J. Englehart, Atty., Federal Labor Relations Authority, Washington, D.C., also entered an appearance for respondent.

Gregory C. Sisk, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., and William Kanter, Atty., Dept. of Justice, were on the brief, for intervenors Veterans Admin., et al. Howard S. Scher, Atty., Dept. of Justice, Washington, D.C., also entered an appearance, for intervenors Veterans Admin., et al.

Before WILLIAMS, D.H. GINSBURG and BOGGS,* Circuit Judges.

Opinion PER CURIAM.

Dissenting opinion filed by Circuit Judge BOGGS.

PER CURIAM:

The Veterans Administration reprimanded Lonnie Carter, a VA employee and President of Local 2031 of the American Federation of Government Employees, AFL–CIO (Local 2031 or the Union), for statements he made in his column ("From the President's Desk") in the Union's newsletter. The Federal Labor Relations Authority upheld the reprimand, and the Union petitions for review, claiming that Carter acted within his rights under (1) § 7102 of the Federal Labor–Management Relations Statute, 5 U.S.C. § 7101 *et seq.* (the Act), which protects, among other things, the right of a federal employee "to.... assist" a labor organization; and under (2) the First Amendment to the Constitution of the United States. For the reasons set forth below, we deny the petition for review without passing upon the constitutional point, which is not properly before us.

I. BACKGROUND

Local 2031 is the exclusive bargaining representative for the approximately 900 employees of the VA Medical Center in Cincinnati, Ohio. Prior to the reprimand here at issue, the Union published a monthly newsletter designed to provide information to employees and to air their grievances; the Union distributed the newsletter to all bargaining unit members and to members of the public who had previously requested copies.

---

* Of the United States Court of Appeals for the Sixth Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a).

Carter's June 1985 column was an attack on Raynold Cole, the Chief of Building Management Services at the Medical Center and the chairman of its Equal Employment Opportunities (EEO) Committee. Prior to then, a number of Center employees had complained to the Union that Cole had, among other things, (1) made various management decisions that had the effect of inhibiting employees from airing their grievances; (2) supervised employees too closely; and (3) failed to assert any decisionmaking authority as EEO chairman, assigning his EEO duties instead to a subcommittee. Carter's column, apparently designed to air these complaints against Cole, read in full as follows:

"Raynold Cole—The Polarity Paradox"

When the Chief of Personnel Service and myself are homogenous on anything, it is indeed an event which is extraordinary but, his captioning of Raynold Cole as a "bozo" is one of the most accurate character assessements [sic] I have ever encountered. Raynold Cole is the variable which was most significant in the decadence of Building Management Service. Under the auspices of Raynold Cole Building Management Service employees' motivational levels have plunged to record lows and the entire service has been engulfed in a state of dysfunctionalism. Raynold Cole has an autocratic style of management and consequently believes employees must be closely scrutinized and cannot be entrusted to carry out their respective tasks autonomously. He has abandoned his obligation to communicate with his employees and treat [sic] them as if they were on a subliminal level in comparison with himself. He has departed from the historical past practice of having one homogeneous staff meeting for all Building Management Service employees and adapted [sic] a new practice of having several isolated section meetings and prohibiting employees from asking questions of any kind. It is oftentimes said that an effective leader is supportive of his subordinates. If support is a prerequisite for the composite parts of an effective lead-

er, Raynold Cole could not be categorized as an effective leader. Under no circumstances does he support his subordinates but rather succumbs in a submissive mannerism to whatever variable is operant, in the absence of sound logic or existant [sic] policy or statute. Raynold Cole is an exact replica of the house negroes whom in exchange for a lesser burden, kept order among the defiant masses to the extent of initiating penalties if the "massah" felt it was warranted. Expertise in labor/management, collective bargaining, management, or EEO were not prerequisites for his position, because he does not possess any of these things. It is the ardent and vehement manner which [sic] he initiates actions and penalties upon instruction in addition to his concurrence with their theories of inferiority. The fact that he came from among rank and file employees has long alluded [sic] him. Raynold Cole's appointment as Chairperson of the EEO Committee is a stereotypical response to EEO: Appoint a Black to serve as a figurehead while his anglo saxon counterpart, the Director makes all the decisions and has absolute authority over the committee. Token appointments such as Raynold Cole's appointment to Chief of Building Management Service are representative of the purported incremental progress the oppressor has attempted to use in the past to mentally enslave blacks and consequently persuade them to deny their heritage in an asinine attempt to substantiate that they are homogeneous with their anglo saxon counterparts. It appears that Raynold Cole is an updated rendition of the infamous era of the past that black artists captioned as "the spook who sat by the door" and the "Uncle Tom" era which plagued and demoralized blacks in the past. AFGE Local 2031 is demanding the removal of Raynold Cole!!

The VA reprimanded Carter in a letter stating that in management's view, his article "contain[ed] statements which [were] derogatory, insulting, and disrespectful about Raynold Cole." Specifically, the VA

charged that Carter, by referring to Cole as an "Uncle Tom" and "the spook who sat by the door" had violated VA regulations, which require a VA employee

> to serve diligently, loyally, and cooperatively; to exercise courtesy and dignity; and to conduct himself, both on and off duty, in a manner reflecting credit upon himself and the Veterans Administration[,] ... [to] avoid any action which might result in, or create the appearance of ... [a]ffecting adversely the confidence of the public in the integrity of the Government[,] ... [and to] live up to common standards of acceptable work behavior.

38 C.F.R. §§ 0.735–10(a) & (b)(6), § 0.735–20(b), and provide that

> The following are considered improper: ... disrespectful conduct; use of insulting, abusive, or obscene language to or about other personnel ...; [and] making false or unfounded statements about other employees which are slanderous or defamatory....

38 C.F.R. § 0.735–20(b).

The Union filed a complaint with the regional office of the FLRA, charging that Carter's statements were protected under § 7102 of the Act, and that the VA, by reprimanding Carter, had committed an unfair labor practice in violation of §§ 7116(a)(1) and (2) of the Act, which declare it to be an unfair labor practice for an agency "to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under [the Act]," or "to encourage or discourage membership in any labor organization...." After a hearing on the Union's complaint, the Administrative Law Judge agreed with the Union's position, and therefore held that Carter's statements could not provide a basis for discipline; accordingly, the ALJ ordered the VA to remove the reprimand from Carter's file.

The FLRA reversed, holding that § 7102 does not protect Carter's statements. The Authority characterized Carter's statements as "racial epithets or the disparagement of a manager based upon racial stereotyping," and concluded that such statements did not merit protection under the Act:

> ... There is a clearly expressed public policy against racial discrimination in the workplace. Racial stereotyping tends to undermine that policy and is not protected. Name-calling by racial stereotyping is neither a statement regarding a party's position on racial matters, which could in some situations be a legitimate insinuation of race into a labor dispute, nor is it part of the mere rough and tumble of "robust debate." Rather, terms such as "Uncle Tom" and "spook who sat by the door" are different from "scab," or other insulting but descriptive epithets. Such terms, while derogatory, do not carry the same vilification of an individual by reference to an entire group by race, rather than by a particular course of action.
>
> The entire thrust of the newsletter was to criticize Cole and it would be fair to characterize that criticism as harsh, although permissible, absent the items referenced specifically here.... [A]n employer is entitled to maintain discipline and not have management subjected to defamatory or libelous statements. In our view, the use of the terms "Uncle Tom" and "spook ...," in the guise of literary or historical allusions, was not protected and ... their use was inexcusable. Quite simply, the use of these terms has no place in the Federal labor-management relations program.

In its petition for review of the Authority's decision, the Union claims that (1) the FLRA erred in concluding that § 7102 does not protect Carter's statements; and (2) those statements were protected by the First Amendment to the Constitution of the United States.

## II. THE UNION'S STATUTORY CLAIM

Section 7102 of the Act provides in relevant part:

> Each employee shall have the right to form, join, or assist any labor organization, or to refrain from any such activity, freely and without fear of penalty or reprisal, and each employee shall be pro-

tected in the exercise of such right. Except as otherwise provided under this chapter, such right includes the right—

> (1) to act for a labor organization in the capacity of a representative and the right, in that capacity, to present the views of the labor organization to heads of agencies and other officials of the executive branch of the Government, the Congress, or other appropriate authorities,....

5 U.S.C. § 7102. The Union contends that Carter's statements were an exercise of his "right to ... assist" a labor organization, as that term and the analogous "right to assist" provision of the National Labor Relations Act have been construed by the front-line administrative agencies and by the federal courts reviewing their decisions. The FLRA, on the other hand, maintains that the freedom of expression component of the "right to ... assist" provision, while broad, is not unlimited, and that the statements at issue in this case went "beyond what is reasonably required to air legitimate labor-management concerns...."

As an initial matter, we note that the parties' exclusive focus on the "right to ... assist" clause of § 7102 may seem somewhat anomalous, given that the more specific provision of § 7102(1) appears to govern this case; in publishing the column here at issue, Carter was unquestionably acting for the Union "in the capacity of a representative and ... in that capacity, ... present[ing] the views of the labor organization." As such, it would appear that because the column was distributed not to "heads of agencies[,] ... other officials of the executive branch of the Government, [or] the Congress, or other appropriate authorities" but rather to members of the Union and of the general public, it does not fall within the statute's specific provision protecting representative speech. *See Meehan v. Macy*, 392 F.2d 822, 829 (D.C.Cir.), *modified*, 425 F.2d 469 (D.C.Cir.1968), *aff'd on rehearing*, 425 F.2d 472 (D.C.Cir.1969) (*en banc*) (the term "other appropriate authority" in Executive Order 10988—on which Executive Order 11491, and later § 7102 of the Act, were based—did not

include the press or members of the general public; the order "by its terms provide[d] for presentations within official channels"). *But cf. Bureau of Prisons v. AFGE*, 17 F.L.R.A. 701 (decision of Administrative Law Judge) (rights enumerated in § 7102(1) are merely illustrative of the right of each employee "to form, join or assist any labor organization"; thus, although the specific right to present the views of the union does not include the right to appeal to the general public, the latter right may be included within the broader "right to ... assist"), *aff'd*, 17 F.L.R.A. 696 (1985) (affirming without discussion). Accordingly, the parties' reliance upon cases construing the NLRA, which does not contain any analog to the closely circumscribed provision for representative speech found in § 7102(1), is somewhat troubling.

In any event, since all of the parties have assumed, both in this court and in the proceedings before the agency, that this case is governed by the general "right to ... assist" clause of § 7102, rather than the more specific "right ... to present ... views" clause of § 7102(1), we will assume, without deciding, that that is the case. The initial question before us, therefore, is whether the FLRA's interpretation of § 7102 is entitled to deference under the standards set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed. 2d 694 (1984). We conclude that it is.

In *NTEU v. FLRA*, 826 F.2d 114 (D.C. Cir.1987), this court held that where a provision of the Act requires the FLRA "to reconcile the tensions that will at times exist between the ... objectives set forth in the Act ..., we are bound to defer to the agency's decisions balancing those objectives unless, in the context of the particular adjudication, the agency's decision is not reasonable, *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782, ... or 'neither rests on specific congressional intent nor is consistent with the policies underlying the Act.' " *Id.* at 121 (quoting *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98

n. 8, 104 S.Ct. 439, 444 n. 8, 78 L.Ed.2d 195 (1983)).

The policies in conflict in *NTEU* were, on the one hand, "the protection of the right of federal employees to the exclusive representation of a union of their choice" and, on the other, "advancement of the government's ability to operate in an effective and efficient manner." *Id.* In the present case, the FLRA was called upon to interpret an employee's broad "right to ... assist" a labor organization—which includes the right to speak out on union-management issues, without fear of reprisal—in light of the Government's interest in maintaining discipline in the workplace. We can think of no reason why the Authority, in striking that balance, is entitled to any less deference than we accord it when the employee interest in question is the right freely to choose an exclusive representative, as it was in *NTEU*.

We have no doubt that the FLRA could reasonably conclude that racial name-calling is inherently a threat to the maintenance of employee discipline. Indeed, the Union does not take issue with this general proposition. In this case, however, the Union claims that the Authority erred in failing to view the terms "Uncle Tom" and "spook who sat by the door" in their context. Had it done so, the Union argues, it would have concluded that the portion of Carter's column in which those terms appeared merely conveyed the message "that Mr. Cole, as a 'token' appointment [to the EEO Committee] ('spook who sat by the door') who does not pursue vigorously enough the objectives of the EEO program ('Uncle Tom'), is a liability to the effective implementation of EEO goals." Thus, the Union claims that the column, properly understood, actually advanced "the union's interest [ ] in *promoting* an effective EEO program." (Emphasis in original.) The Union also points to the intraracial context of the remarks (both Carter and Cole being black) as evidence that, in criticizing Cole, Carter was neither casting him in terms of a racial stereotype nor attempting to appeal to racial prejudice, but rather was endeavoring on behalf of the Union "*to denounce* conduct by the EEO Committee Chairman which perpetuated racial prejudices in the agency." (Emphasis in original.)

We agree with the Union, as did the FLRA, that the column, read as a whole, could be seen as a legitimate criticism of Cole's performance both as a manager and as chairman of the EEO Committee. We also agree that the intraracial character of the remarks is a relevant nuance that makes them somewhat more difficult to assess: the thrust of Carter's criticism of Cole clearly was not that Cole's alleged shortcomings were due to his race, but rather that he had betrayed his race by serving as a token appointment and failing adequately to champion the interests of the black employees as against those of white management.

It was not unreasonable, however, for the FLRA also to find that Carter's remarks constituted "the disparagement of a manager based on racial stereotyping," and that, as such, they did not fall within the protection of the statute. Even though Carter's statements were directed at a member of his own race, they could legitimately be understood as a broader appeal—criticism of Cole being only the vehicle—to further racial polarization between black VA employees and white managers ("massah" to Cole's "Uncle Tom"). The FLRA could reasonably conclude that, due to the inherently disruptive nature of statements tending to generate or to exacerbate racial conflict in the workplace, such statements "ha[ve] no place in the Federal labor-management relations program." Given the difficult balance the agency must strike when the statutory protection of employee speech conflicts with the Government's need for discipline in the workplace, we cannot conclude that it acted unreasonably in striking that balance as it did in this case, nor that its decision "is [in]consistent with the policies underlying the Act." *NTEU*, 826 F.2d at 121 (citation omitted).

## III. The Union's First Amendment Claim

The Union next claims that, even if Carter's speech does not fall within the protec-

tion of § 7102, it is nonetheless protected by the First Amendment to the Constitution of the United States, as construed by the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and its progeny.

The fatal difficulty with the Union's first amendment argument is simply that the Union did not make it first before the agency. The Act specifically bars the court from considering "[any] *objection* that has not been urged before the Authority ..., unless the failure or neglect to urge the *objection* is excused because of extraordinary circumstances," 5 U.S.C. § 7123 (emphasis added), and the Supreme Court has made clear that the statutory bar is jurisdictional. *EEOC v. FLRA*, 476 U.S. 19, 23, 106 S.Ct. 1678, 1680, 90 L.Ed.2d 19 (1986).

The Union has advanced no "extraordinary circumstances" that would excuse its failure to present its first amendment argument to the FLRA. Instead, it claims that because the VA anticipated that the Union would make a first amendment argument before the FLRA and the VA therefore contended that Carter's speech was not constitutionally protected, the first amendment issue was before the Authority and thus may be considered by this court.

We do not think that a party that failed to present a particular "objection" to the agency can evade the jurisdictional bar of § 7123 simply because its adversary, in the administrative proceedings, argued that, should that objection be raised, the agency should reject it. The Supreme Court has made it clear that, in enacting § 7123, Congress intended the FLRA to have the first opportunity to pass upon whatever issues may arise, *EEOC*, 476 U.S. at 23, 106 S.Ct. at 1680. It follows that an objection must actually be presented to the agency; a respondent's merely alluding to an issue in anticipation that the objection might be raised does not itself raise the objection. We note without surprise, therefore, that the Authority's decision in this case does not even mention the first amendment; it simply was not put in issue.

Because the Union's constitutional argument is not properly before us, we intimate no view whatsoever about its merits.

## IV. CONCLUSION

For all the foregoing reasons, the Union's petition for review of the FLRA's decision is

*Denied.*

BOGGS, Circuit Judge, dissenting:

I must respectfully dissent from the court's opinion in this case. I agree with Judge Ginsburg's opinion that the FLRA's interpretation of its governing statutes is entitled to deference, and that the FLRA *could* find that a particular use of racial appellations by the union could have such a detrimental effect on workplace discipline as to outweigh a union member's right to free speech. However, in the case before us, there is not the slightest indication that the FLRA actually undertook to balance these interests; instead, contrary to the relevant statute and precedents, it appears to have adopted a *per se* rule rendering all racially-motivated statements actionable by management.

As the court's opinion indicates, there is some possibility of confusion in past FLRA precedents as to whether speech of the type at issue here should be considered under the "right to assist" language of § 7102, or the "presentation of views" language of § 7102(1). The court correctly cites *Meehan v. Macy*, 392 F.2d 822, 829 (D.C.Cir.), *modified*, 425 F.2d 469 (D.C.Cir. 1968), *aff'd on reh'g*, 425 F.2d 472 (D.C.Cir. 1969) (en banc), and *Bureau of Prisons v. AFGE*, 17 F.L.R.A. 696 (1985), as embodying this problem. However, in that both the court and the parties premise the consideration of this case on the applicability of the "right to assist" provision, I, too, will accept that premise despite my reservations regarding the proper resolution of this issue.

I believe a brief view of the relevant authorities demonstrates that punishment for exercising speech rights, while permissible in certain circumstances, must be undertaken with an eye to particular circum-

stances, and not as a blanket proscription of certain types of speech. The FLRA has recognized that the Statute protects union speech on issues of concern to employees. *See, e.g., Department of the Air Force, 3rd Combat Support Group,* 29 F.L.R.A. 1044, 1048 (1987) ("the right to publicize matters affecting unit employees' terms and conditions of employment, while not unfettered, is a right protected under section 7102 of the Statute"); *Overseas Federation of Teachers,* 21 F.L.R.A. 757, 759 (1986) ("the Authority has expressly ruled under section 7102 that the legitimate conduct of an employee, acting in a representative capacity, to publicize and communicate information on issues having a direct bearing on the working conditions of unit employees enjoys the protections of the Statute"). *See also Veterans Administration Medical Center, Bath, New York,* 12 F.L.R.A. 552, 576 (1983) ("when an employee who is also a Union official is acting in an official capacity as a union official, he is entitled to greater latitude in speech and action"); *Veterans Administration Regional Office, Denver, Colorado,* 2 F.L.R.A. 668, 675–76 (1980) ("When acting officially in his capacity as an official of a labor organization, a union official must have very broad latitude in speech and action"). For example, the Authority upheld an ALJ's finding that section 7102 of the Statute protected a union leaflet which criticized a supervisor's behavior and referred to her as "this season's holiday turkey." *Internal Revenue Service, North Atlantic Service Center,* 7 F.L.R.A. 596 (1982). The leaflet was protected, the Authority agreed, because it was more than a personal attack on a superior; it also enumerated the working conditions and practices the union was unhappy with and awarded the "holiday turkey" distinction because the supervisor was responsible for those conditions and practices. *Id.* at 603–04. Significantly, the Authority concluded that "the inclusion of insulting or derogatory references to management officials in [union] literature [was] an insufficient basis for removing the distribution of the literature" from the protection of the Statute. *Id.* at 604.

Another case in point is *Department of Housing and Urban Development, San Francisco Area Office,* 4 F.L.R.A. 460 (1980). There, the union complained that the employer had violated § 7116(a)(1) by reprimanding the local union president for remarks she made while representing an employee at grievance meetings with management officials. The record revealed that on one occasion, the union president had accused a supervisor of being "racist, sexist and ageist" and of discriminating against Asians on his staff. On a second occasion, the president had reiterated that she thought the supervisor was a racist because he preferred to deal with the grievant's black representative instead of the union president, who was white. In the Authority's view, although the president's statements were "inherently inflammatory, [they] were related to the grievant's expressed concerns that her supervisor had been discriminating against her." *Id.* at 466. The Authority concluded that although such "indelicate and intemperate language" in the conduct of labor-management relations was not to be condoned, the president "was merely attempting to represent the position of a unit employee." *Ibid.*

On the other hand, the Authority has also recognized that countervailing needs may justify restrictions on, and punishment for, certain kinds of speech. In *Department of the Navy, Puget Sound Naval Shipyard,* 2 F.L.R.A. 54, 55 (1979), the FLRA indicated that, while an "employee's right to engage in protected activity permits leeway for impulsive behavior," flagrant misconduct by that employee, "even though occurring during the course of protected activity, may justify disciplinary action by the employer." Since *Puget Sound,* the Authority has lumped these types of cases under the heading of "flagrant misconduct," *see, e.g., Long Beach Naval Shipyard,* 25 F.L.R.A. 1002, 1005 (1987); *Veterans Administration Medical Center, Bath, New York,* 12 F.L.R.A. 552, 576 (1983); but a closer examination reveals the Authority's concern for those special circumstances that have been relevant

in private sector cases: the need to maintain discipline, to prevent the disruption of operations, and to promote legitimate safety concerns. *See, e.g., United States Forces Korea/Eighth United States Army,* 17 F.L.R.A. 718 (1985) (union president's letter to Korean newspaper criticizing United States General for, *inter alia,* his personnel policies and for referring to the Korean people as "lemmings" who are willing to follow any leader was unprotected, because it "undermine[d] the credibility ... of U.S. government officials in a foreign country" and had "no reasonable nexus to [the] union's legitimate labor relations problems"); *Bureau of Prisons, Federal Correctional Institution,* 17 F.L.R.A. 696 (1985) (union official's statement to the media seeking to publicize issues having a direct bearing upon the working conditions of unit employees in a prison setting enjoys protection under the Statute, where there is no showing that "the release of information to outside parties could prejudice the maintenance of security and order within such an institution"); *Department of Defense, Defense Mapping Agency Aerospace Center,* 17 F.L.R.A. 71 (1985) (employee's deliberate use of "abusive language," which was "not pertinent to a discussion of the grievance under consideration," was flagrant misconduct); *Defense Logistics Agency,* 16 F.L.R.A. 101 (1984) (union representative's "deliberate flouting of the employer's initial effort to impose rudimentary standards of appropriate conduct for the meeting [between employees and the employer] so as to maintain a modicum of order and respect" constituted flagrant misconduct, especially where "nothing pertinent, appropriate or useful was said respecting grievances or the other method of their presentation").

Here, the agency gave two grounds for its decision. The first was that the article contained statements that were "derogatory, insulting and disrespectful," and the second that it was "published and distributed with reckless disregard of whether the article was true or false." Neither of these grounds is sufficient to uphold the decision.

The Authority correctly found that most of Carter's article was related to employee concerns and therefore was protected. As noted above, the law is that such articles are protected, and they are protected even if the remarks are indeed derogatory, insulting and disrespectful. The Authority found, however, that the racial references were unprotected because they constituted "racial stereotyping," which had a tendency to undermine the "clearly expressed public policy against racial discrimination in the work place." The Authority's concern for the elimination of such discrimination is laudable, but I find no authority in either the Statute or its interpretation for excising a certain class of speech or certain modes of expression on a matter relating to employee concern from the general protection of the Statute. Terms with some reference to races or other identifiable groups have, over time, varied from being terms of opprobrium to being preferred usage (e.g., "Black"). The connotation of a term can range widely, depending on the context, the speaker, and the person addressed, from badinage to bastinadoing. Federal officials and the courts cannot be a language police, assessing the exact degree of vigor or insult of a term and measuring it against some objective standard.

While it is appropriate to say that employment decisions should not be based on racial factors, it is quite different to say that a union cannot make use of a race-related term in communicating with members and others on work-related issues. The Authority's strict rule against using racial references seeks to eliminate discrimination at the expense of the equally important and protected right of free speech. If the federal policy favoring uninhibited, robust, and wide-open debate is to have any meaning, there must be room in appropriate circumstances for use of even derogatory racial references. The appropriate limitation comes from the general doctrine allowing restrictions on speech that poses a threat to discipline, to operations, or to safety.

Words relating to race may be an effective way to convey a work-related message to those targeted as the audience, just as the extremely emotional term "scab" did in

*Old Dominion Branch No. 46 v. Austin,* 418 U.S. 264, 282–83, 94 S.Ct. 2770, 2780–81, 41 L.Ed.2d 745 (1974). As the court in *Old Dominion* made clear, "Federal law gives a union license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point." *Id.* at 283, 94 S.Ct. at 2780–81. Protected speech that others find objectionable, for whatever reason, must not be refuted by disciplinary action, but by the force of competing ideas, at least where the special circumstances of demonstrable effect on discipline or efficiency have not been shown.

Although I agree that reviewing courts must defer to the Authority's assessment of the balance to be struck between protected speech on the one hand and the employer's important management interests on the other, the Authority in this case failed actually to strike the balance on management interests. Rather, it imposed a penalty because the union used a particular type of obnoxious speech, without making a finding on the actual effect of such speech on discipline and efficiency, the only legitimate grounds on which the government may punish workers for work-related speech. Accordingly, I would set aside the Authority's order and remand for further consideration consistent with this opinion.[1]

---

**1.** The Union also argues that Lonnie Carter's article was protected under the first amendment. It is worthy of note that the Statute creates "substantive rights to union membership and participation which are more extensive than those same rights as protected by the first amendment." *Carter v. Kurzejeski,* 706 F.2d 835, 842 (8th Cir.1983). Whereas the first amendment only protects speech on matters of public concern, *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Statute goes beyond that, protecting speech that addresses "internal office matters" such as the terms and conditions of employment. In any event, because the Union never raised the first amendment issue before the FLRA, and the Authority never addressed it, I also would decline to reach the constitutional claim.