**STEAM PRESS HOLDINGS, INC., dba Young Laundry and Dry Cleaning; Michael Drace, Plaintiffs–Appellees,**

v.

**HAWAII TEAMSTERS AND ALLIED WORKERS UNION, LOCAL 996; Mel Kahele, as an individual, Defendants–Appellants.**

**Steam Press Holdings, Inc., dba Young Laundry and Dry Cleaning; Michael Drace, Plaintiffs–Appellants,**

v.

**Hawaii Teamsters and Allied Workers Union, Local 996, Defendant–Appellee.**

and

**Mel Kahele, as an individual; Hawaii Teamsters Health & Welfare Trust Fund; Doe Defendants 1–150, Defendants.**

**Nos. 01–17222, 02–15097.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 10, 2002.

Filed Aug. 26, 2002.

Deborah Drooz, Strook & Stroock & Lavan, Los Angeles, CA, and Jeffrey L. Cutler, Elizabeth Rosenfeld, Wohlner Kaplon Phillips Young & Cutler, Encino, CA, for the defendants-appellants-appellees.

Jared H. Jossem, Dwyer Schraff Meyer Jossem & Bushnell, Honolulu, HI, for the plaintiffs-appellees-appellants.

Fred H. Altshuler, Linda Lye, Altshuler, Berzon, Nussbaum, Rubin & Demain, San Francisco, CA, for the amici curiae.

Before: GOODWIN, HAWKINS and FISHER, Circuit Judges.

GOODWIN, Circuit Judge.

Michael Drace and Steam Press Holdings, Inc., dba Young Laundry and Dry Cleaning, sued Mel Kahele and Hawaii Teamsters and Allied Workers, Local 996, in federal district court alleging that (1) defendants made defamatory statements of and concerning plaintiffs during the course of a labor dispute; (2) defendants breached a no-strike clause in a collective bargaining agreement ("CBA"); and (3) defendants engaged in racketeering. The district court found in favor of plaintiffs on the defamation claim, awarding damages for economic and reputational harm caused by the defamatory statements, and found in favor of defendants on the remaining claims. Both parties appeal.

We have jurisdiction pursuant to 28 U.S.C. § 1291. For the reasons that follow, we (1) reverse the district court's holding on the defamation issue; (2) affirm the district court's disposition of the RICO and breach of collective bargaining agreement issues; and (3) affirm the district

court's denial of plaintiffs' request for attorneys' fees.

## BACKGROUND

This appeal arises out of a labor dispute involving the employees of Young Laundry and Dry Cleaning, Inc. ("YLDC"), a retail laundry and dry cleaning business operating in Hawaii. In September 1994, Michael Drace purchased YLDC from its prior owner, David Applebaum. Drace has been the president and owner of YLDC since the time of the purchase.[1]

Hawaii Teamsters and Allied Workers, Local 996, (the "Union") is a labor organization, as defined in 29 U.S.C. § 152(5). Mel Kahele was president of the Union at all times relevant to these proceedings. As of July 1998, the Union had approximately 5400 members and was a party to collective bargaining agreements with approximately 68 employers, one of whom was YLDC.

At the time of Drace's purchase of YLDC, the Union and YLDC were parties to a collective bargaining agreement (known as the Master Laundry Agreement ("MLA")) which governed the YLDC employees' wages, benefits, and working conditions. As a condition of Drace's purchase of YLDC, the Union was asked to make certain concessions on employee wages and benefits. The Union agreed to these concessions, and the concessions became part of the Memorandum of Agreement ("MOA"), which modified the terms of the MLA. YLDC's employees understood the concessions as a loan that would be repaid to them by Drace upon the expiration of the MOA. By its express terms, the MOA remained in effect until September 30, 1998.

Shortly before the expiration of the MOA, the Union and the Employers en-

---

1. Drace and YLDC are collectively referred to as the "Employers."

tered into negotiations on a new contract. In a letter dated July 13, 1998, the Union proposed restoration of the benefits that had been reduced or eliminated when Drace purchased YLDC in 1994. In response, Drace claimed that YLDC was in financial trouble and proposed further reductions in employee benefits and wages. Drace also invited the Union to arrange for an accountant to review YLDC's books.

On July 28, 1998, the Union informed Drace that it was conducting its own research into YLDC's finances and that it would organize a negotiating committee. The Union asked the International Brotherhood of Teamsters to provide it with financial information regarding YLDC.

On September 2, Union representatives met with Drace and others to discuss YLDC's proposals. Drace, employing various charts and graphs, explained to the Union representatives that YLDC was in financial distress. One Union member reacted by telling Drace that charts can be "made to show anything that [one] wants them to show." After Drace's presentation, the Union again proposed the restoration of the benefits that had been conceded in 1994, along with wage increases for each of the following three years. The meeting ended without an agreement.

On or around September 8, the Teamsters responded to the Union's request for financial information about YLDC by sending the Union a Dun & Bradstreet Report ("D & B Report") on YLDC. The district court found that the D & B Report and supporting documents "contain[ed] numerous indications of YLDC's poor financial health."

The parties held their second bargaining session on September 10. Drace presented his third proposal (which was substantially similar to his earlier proposals). During this meeting, Union representatives inquired about a company called "Steam Press, Inc." Although Drace had

formed Steam Press in 1995 as a holding company for YLDC, Union members had only recently discovered the company's existence. Kahele asked Drace what Steam Press was, and Drace replied that it was a company set up to invest the profits of YLDC. The Union's questions concerning Steam Press prompted Mr. Jossem, YLDC's attorney, to ask if the Union was calling Drace a liar. Union member Jesse Apodaca Torres responded "we can," to which Kahele added "we will." The Union ultimately rejected Drace's proposal.

On the following day, near a dumpster outside the YLDC plant, the Union held a meeting to discuss the status of contract negotiations with YLDC employees. The number of employees present changed over the course of the meeting, ranging from a low of forty to a high of eighty.

Hannah Kilakalua, a YLDC employee, attended this meeting and later testified that Kahele stated at the meeting "Mike is making money" and "Mike Drace is making money from the Steam Press." Kilakalua further testified that "everybody was mad" after Kahele made the statement "Mike is making money."

Drace, although not present at the meeting, testified that after the meeting he spoke with Bernard Roque, a member of the Union negotiating team. Roque told Drace that he was at the meeting and that he resigned from the negotiating team after hearing that YLDC was hiding seven to ten million dollars. The district court found "that Kahele stated at the September 11 meeting that Mike Drace was making money and that he was hiding the money in Steam Press."

On September 17, a third negotiation session took place, resulting in the parties agreeing that they were at an impasse. On September 25, the Union agreed to have its accountant examine YLDC's books. Kahele accompanied Union ac-

countant Terry Takaki to YLDC's offices where they reviewed the consolidated books and records of YLDC and Steam Press. After examining these materials, Takaki informed Kahele that YLDC did not have any money. Shortly thereafter, Kahele and Takaki put the review of YLDC's financial records on hold.

The Union held a strike authorization vote on September 29. YLDC employees voted 80–8 in favor of a strike. Relying on the testimony of Kilakalua, the district court found that "At the strike vote, Kahele, as well as others, made statements that Drace was making money from Steam Press and that the Union was going to check on that." On October 8, the Union went on strike. The strike lasted until May 1999, when YLDC's employees decertified the Union.

Shortly before the strike ended, Drace and YLDC sued the Union and Kahele in federal district court, alleging, *inter alia*, that (1) the strike violated a no-strike clause in the collective bargaining agreement; (2) the Union was guilty of defamation; and (3) Kahele and others had engaged in racketeering in violation of 18 U.S.C. § 1961.

The district court disposed of the Employers' racketeering claim at the summary judgment stage, granting the Union's motion for summary judgment. The court found that the Employers had failed to demonstrate either "closed-ended" or "open-ended" continuity, and therefore held that the Union had not engaged in a "pattern" of racketeering activity, as required by 18 U.S.C. § 1961.

The court disposed of the Employers' remaining claims following a bench trial. Pursuant to section 301 of the Labor Man-

agement Relations Act, the Employers alleged that the Union breached the no-strike clause of the MLA. Specifically, the Employers alleged that the October 8 strike was a breach of Section 29 of the MLA, which prohibited strikes while the agreement was in force.[2]

The district court found that the MLA, by its express terms, still governed the parties at the time of the strike. The court also found, however, that the Employers were "estopped from arguing that the MLA continued to be in force because they had repudiated it prior to the beginning of the strike on October 8, 1998." Accordingly, the court entered judgment in favor of the Union.

Lastly, with respect to the state law defamation claim, the court found in favor of the Employers. The court found that Kahele's statements that "Drace was making money" and "hiding it in Steam Press" were false, and that Kahele made them with reckless disregard for their truth.

The district court awarded both Drace and YLDC damages for injuries that it found were caused by Kahele's defamatory statements. The court awarded Drace $50,000 to compensate him for injury to his reputation, and $50,000 to compensate him for emotional distress. Additionally, finding that Kahele's defamatory statements caused the employee strike, the court awarded YLDC approximately one million dollars in damages "flowing from the strike." The damages award to YLDC was based on a number of factors, including YLDC's loss of productivity as a result of the strike; lost profit on retail and commercial sales as a result of the strike; and direct expenses resulting from the

**2.** Section 29 of the MLA provides: "The parties hereto agree that during the term of this agreement there shall be no lockout by the Employer, nor any strike, sitdown, refusal to work, stoppage of work, slowdown, retarda-

tion of production, or picketing of the Employer on the part of the Union or its representatives or on the part of any employee covered by the terms of this agreement."

strike (e.g., hiring security guards to protect against damage to YLDC's facilities). The court also awarded YLDC damages for harm to its reputation "[a]s a result of the defamatory statements and the resulting strike of YLDC employees." This appeal followed.

## DISCUSSION

### I. The Union's Appeal

The Union challenges the district court's defamation judgment and award of damages to the Employers. In particular, the Union contends that Kahele's statements that Drace "is making money" and "hiding money in Steam Press" are not defamatory. The Union also contends that Kahele's statements are not "of and concerning" plaintiff YLDC, and that the statements were not made with "actual malice."

Defamation claims predicated on statements or publications made in the context of a labor dispute are governed by *Linn v. United Plant Guard Workers, Local 114,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). In *Linn,* an employer brought a state law libel action against a labor union alleging that the union had libeled the employer during the course of a labor organization campaign. The Court, finding that the National Labor Relations Act ["NLRA"] did not entirely preempt state law libel actions predicated on libels made during the course of labor disputes, held that such actions are permissible so long as "[a] complainant can show that the defamatory statements were circulated with malice and caused him damage." *Id.* at 64–65, 86 S.Ct. 657; *see also Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 273, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) ("[In *Linn* ] we held that libel actions under

state law were pre-empted by the federal labor laws to the extent that the State sought to make actionable defamatory statements in labor disputes which were published without knowledge of their falsity or with reckless disregard for the truth.").

Thus, under *Linn* and its progeny, a complainant pursuing a state-law defamation action predicated on a statement made during the course of a labor dispute must prove (1) that the allegedly defamatory statement asserts a fact or "impl[ies] an assertion of objective fact," *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *see also Linn,* 383 U.S. at 58 n. 2, 86 S.Ct. 657; *Underwager v. Channel 9 Australia,* 69 F.3d 361, 366(9th Cir.1995); *Unelko Corp. v. Rooney,* 912 F.2d 1049, 1053 (9th Cir. 1990); (2) that the factual assertion is false, *Milkovich,* 497 U.S. at 16, 110 S.Ct. 2695; *Letter Carriers,* 418 U.S. at 283–84, 94 S.Ct. 2770; *Unelko,* 912 F.2d at 1055–56; and (3) that the speaker published the challenged statement with "actual malice." *Letter Carriers,* 418 U.S. at 281, 94 S.Ct. 2770; *Linn,* 383 U.S. at 64–65, 86 S.Ct. 657; *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The First Amendment further requires that the challenged statement be "of and concerning" the complainant. *Sullivan,* 376 U.S. at 288, 292, 84 S.Ct. 710.

Here, the district court explicitly found that Kahele's statements were false.[3] The district court implicitly found (1) that Kahele's statements implied assertions of objective fact, and (2) that Kahele's statements were of and concerning plaintiffs Drace and YLDC. The court also found that Kahele made the statements with

**3.** The parties do not dispute the fact that YLDC was experiencing financial difficulties during and prior to the labor dispute. However, the parties vigorously dispute whether

Kahele knew or had reason to believe, at the time the challenged statements were made, that YLDC was experiencing financial difficulties.

reckless disregard for their truth, and therefore that the actual malice standard was satisfied.

## A. Defamatory meaning.

The Union begins its attack on the district court's judgment by arguing that Kahele's statements do not imply assertions of objective fact.[4] According to the Union, the application of this circuit's "totality of the circumstances" test to the challenged statements reveals that the statements are "rhetorical hyperbole or opinion" incapable of being proved true or false. The Union maintains that, because the challenged statements do not possess a defamatory meaning, they are not actionable and therefore the district court erred in reaching the issue of actual malice.

■■■ In response, the Employers ask that we decline to reach the merits of the Union's argument because it is being raised for the first time on appeal. Although as a general rule courts of this circuit will not consider arguments on appeal that were not properly raised at the lower court level, *see, e.g., In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir.1989), the Employers confuse the making of legitimate legal arguments about existing issues with the impermissible introduction of new legal theories or defenses. The Union's argument arises out of the Employers' claim of defamation, and was ruled on (at least implicitly) by the district court. Thus, we consider the Union's argument in its entirety.

■■■ Turning to the merits, we must determine whether a reasonable factfinder could conclude that Kahele's statements

imply an assertion of objective fact. *Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir.1995); *see also Gilbrook v. City of Westminster*, 177 F.3d 839, 861–62 (9th Cir.1999) ("[A] court reviewing a defamation claim must ask a threshold question: Could a reasonable factfinder conclude that the contested statement implies an assertion of objective fact?"); *Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191, 195 (8th Cir.1994) ("The presence of a false statement of fact is a *sine qua non* for the maintenance of state defamation action in the labor field."). A district court's determination of whether an allegedly defamatory statement implies an assertion of objective fact is a question of law which we review de novo. *Koch v. Goldway*, 817 F.2d 507, 508 (9th Cir.1987); *Info. Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781, 783 (9th Cir. 1980).

■■■ In *Underwager v. Channel 9 Australia*, 69 F.3d 361 (9th Cir.1995), this circuit set forth the following test to guide the inquiry into whether an allegedly defamatory statement implies an assertion of objective fact:

> To determine whether a statement implies a factual assertion, we examine the totality of the circumstances in which it was made. First, we look at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work. Next we turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language

---

4. The Union suggests that there was insufficient evidence to warrant the district court's finding that Kahele said that "Drace *is hiding* money in Steam Press." The Union correctly points out that, in her testimony, Hannah Kilakalua did not explicitly state that Kahele spoke the words "Drace is hiding money."

Nevertheless, a reasonable finder of fact could have understood from Kilakalua's testimony as well as other evidence in the record that Kahele said that Drace was hiding money. We need not, however, resolve this issue because, as discussed *infra,* we conclude that the challenged statements are not defamatory.

used and the reasonable expectations of the audience in that particular situation. Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false. *Id.*, at 366; *see also Rooney*, 912 F.2d at 1053; *Partington*, 56 F.3d at 1153. If Kahele's statements do not imply assertions of objective fact, then the statements are protected under federal labor law. *Letter Carriers*, 418 U.S. at 286–87, 94 S.Ct. 2770.

■ The first factor we consider is the broad context of Kahele's statements, paying particular attention to setting, subject matter, format, and tenor. *Underwager*, 69 F.3d at 366. Here, the setting was a labor dispute which had been years in the making. The origins of the dispute dated back to the concessions made by YLDC's employees at the time of Drace's acquisition of YLDC in 1984. In 1988, when the Union asked Drace to "repay" these concessions, Drace claimed that he was unable to do so because of YLDC's poor financial health. Drace made alternative proposals, which the Union repeatedly refused to accept. The Union offered counter-proposals, which Drace similarly refused to accept. These negotiations went on for months, during which time the disputants' positions became further entrenched and their treatment of one another grew increasingly hostile. The negotiations ended in an impasse, which was followed by a strike and the eventual decertification of the Union.

Labor disputes are oftentimes difficult, discordant, drawnout affairs in which both labor and management exaggerate the strength of their bargaining positions in an attempt to coerce their opponent into concession. As *Linn* recognized: "[T]he language that is commonplace [in a labor dispute] might well be deemed actionable per se in some state jurisdictions. Indeed, representation campaigns are frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions. Both labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language." *Linn*, 383 U.S. at 58, 86 S.Ct. 657 (citing *Cafeteria Employees Union, Local 302 v. Angelos*, 320 U.S. 293, 295, 64 S.Ct. 126, 88 L.Ed. 58 (1943)); *see also NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 488–89, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960) (observing that "The parties [to a collective bargaining agreement] ... proceed from contrary and to an extent antagonistic viewpoints and concepts of self-interest. The system has not reached the ideal of the philosophic notion that perfect understanding among people would lead to perfect agreement").

In such a heated and volatile setting, even seemingly "factual" statements take on an appearance more closely resembling opinion than objective fact. *See Underwager*, 69 F.3d at 367 (finding that statements made in "heated debate" were more like opinions than factual assertions); *Leidholdt v. L.F.P., Inc.*, 860 F.2d 890, 894 (9th Cir.1988) (observing that "[e]ven apparent facts must be allowed as opinion when the surrounding circumstances of a statement are those of a heated political debate") (internal quotation marks omitted); *Info. Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir.1980) (observing that "[e]ven apparent statements of fact may assume the character of statements of opinion, and thus be privileged, when made in ... [a] heated labor dispute").

Further, the format, subject matter, and tenor of Kahele's statements suggests that the statements were a rhetorical device employed to further the Union's bargaining strategy, not statements of objective

fact. The statements were made at internal union meetings. Both the September 11 and the September 29 statements followed Drace's refusal to meet the Union's demands. Accordingly, Kahele's statements may have been intended to communicate to those present that, regardless of YLDC's financial condition, the Union had to compel Drace to address their concerns. Alternatively, Kahele's statements could have been a way of demanding that Union members and YLDC employees call Drace's bluff, e.g., Kahele may have been saying to the Union "now is not the time to concede." In sum, the broad context of Kahele's statements weighs in favor of construing the statements as opinion rather than as objective fact.

The second factor we consider is the specific context and content of the statements. *Underwager*, 69 F.3d at 366. This factor requires us to evaluate "the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in [the] particular situation." *Id.*

The Union insists that Kahele's statements are "loose, figurative expression[s] that suggest to the listener that the speaker is communicating an impression or idea but not an objective fact." We disagree. Kahele's statements, rather than employing figurative and loose language, employ plain, unadorned language. Although Kahele's terminology is somewhat abstract, e.g., "making money" and "hiding money," Kahele's statements do not employ the type of language that courts of this circuit have previously found to be loose and figurative. *See id.* at 367(finding statements that plaintiff "must have trouble sleeping" and "was obviously looking at greener pastures" to be colorful, figurative rhetoric); *see also Weiner v. San Diego County*, 210 F.3d 1025, 1032(9th Cir.2000) (finding district attorney's statement to press that "cases, unlike fine wine, get worse rather than better, with age" to employ figurative

language); *Cochran v. NYP Holdings*, 58 F.Supp.2d 1113, 1124(C.D.Cal.1998) (finding statement that "[plaintiff] will say or do just about anything to win, typically at the expense of the truth" to be "loose and figurative").

Nevertheless, the absence of loose, figurative language here is of only minimal significance because the Union meetings at which Kahele made his statements were "circumstances in which an audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric, or hyperbole." *Info. Control Corp.*, 611 F.2d at 784 (internal quotation marks omitted); *see also Gilbrook*, 177 F.3d at 862("During the course of a public debate or a labor dispute, a reasonable audience would anticipate epithets, fiery rhetoric, or hyperbole."); *Underwager*, 69 F.3d at 367 (observing that audience to discussion of legal defense tactics "would expect emphatic language on both sides" and therefore "would be likely to recognize that the statements did not represent provable assertions"); *Films of Distinction, Inc. v. Allegro Film Prods., Inc.*, 12 F.Supp.2d 1068, 1081 (C.D.Cal. 1998) (finding that audience viewing film, which depicted youth watching Crime Channel and proceeding to commit several murders, "would understand that the statements did not represent provable assertions, particularly in light of the ongoing public debate over what causes children to commit violent crimes").

The Employers maintain, however, that the reasonable expectations of the audience in this particular case were that Kahele's statements were factual assertions. In support of this contention they rely on the district court's finding (1) that Kilakalua "believed what the Union told her to be true" and (2) that "Kilakalua's reaction to the statements made by the Union reflected the reaction of other bargaining unit employees."

Although there is support in the record for the district court's first finding, i.e., that Kilakalua believed what the Union told her to be true, the record does not support the court's imputation of Kilakalua's belief to the other employees. Even assuming, however, that Kilakalua and the other employees believed Kahele's statements to be true, believing a statement to be "true" is not synonymous with believing a statement to be "an assertion of objective fact." Kilakalua may very well have believed that what Kahele said was true, but this does not in itself remove Kahele's statements from the realm of opinion.

Moreover, an examination of the entirety of Kilakalua's testimony supports the conclusion that the reasonable expectation of Kahele's audience would *not* be that Kahele's statements asserted objective fact. Kilakalua testified that, on September 29, "Mr. Kahele said Mike Drace is making money from the Steam Press, and *they going check on that*." Based on this testimony, the district court found that Kahele "state[d] that Drace was making money from Steam Press and that *the Union was going to check on that*." The phrase "going to check on that" is a significant qualifier because it gave Kahele's audience a reason to construe his statements as opinion rather than fact.[5]

Additionally, Kilakalua testified that she heard Drace's side of the story from Drace himself, who told her that he "wasn't making money from the Steam Press." Kilakalua "didn't believe [Drace] because the union already told [the employees] that he was making money." A reasonable audience confronted with two competing stories, in the context of a heated labor dispute, would be inclined to conclude that each story represented the subjective view, or the negotiating stance, of the particular speaker; the audience would be reluctant to view either story as objective fact. Kilakalua's testimony suggests merely that she chose to believe the Union's—rather than the Employers'—side of the story. Thus, as with the broad context of Kahele's statements, we find that the specific context weighs in favor of construing the statements as opinion.

Lastly, we must determine whether the statements at issue are provable as true or false. *Underwager*, 69 F.3d at 366. In conducting our inquiry, we are guided by the maxim that "where the question of truth or falsity is a close one, a court should err on the side of nonactionability." *Partington*, 56 F.3d at 1159.

The Union contends that the statements "Drace is making money" and "Drace is hiding money" are abstract phrases lacking specific referents. The Union emphasizes that, because each phrase is subject to multiple interpretations, they are not susceptible of verification. Accordingly, the Union continues to argue that the statements are more like opinion than fact.

The Employers maintain that Kahele's statements are necessarily false because YLDC was experiencing financial difficulty during and prior to the strike. They emphasize that "[the fact that] YLDC was not making money was proven true by Defendants' own [accountant], and Kahele knew it." The Employers contend that, because the statements are provable as true or false, they should be construed as fact rather than opinion.

The fatal flaw in the Employers' argument is that it assumes the meaning of the

---

5. The Employers point out that, immediately prior to the strike vote, Kahele and Takaki stopped working on the review of YLDC's financial records. Although this fact would be relevant to an inquiry into actual malice, it does not assist us in determining the reasonable expectations of Kahele's audience because there is no evidence that Kahele's audience knew that the inquiry into YLDC's financials had been put on hold.

terms upon which it relies. A phrase like "making money" does not possess a singular, concrete, and therefore readily verifiable, meaning. One seeking to prove the truth or falsity of Kahele's statements would need to clarify the meaning of the statements in order to become capable of determining whether they have an empirical foundation. For example, does the term "money" refer to profit or does it refer to earnings? What is the temporal scope of the phrase "making money"? Is the speaker referring to quarterly earnings, annual profit, or some other figure? Phrased in such abstract language, Kahele's statements do not rest on a "core of objective evidence," *Underwager*, 69 F.3d at 367, and are simply not susceptible of being proved true or false. Thus, this factor, like the previous two, weighs in favor of construing Kahele's statements as opinion rather than fact.

 Freedom of speech is an essential component of the labor-management relationship. Collective bargaining will not work, nor will labor disputes be susceptible to resolution, unless both labor and management are able to exercise their right to engage in "uninhibited, robust, and wide-open" debate. *Sullivan*, 376 U.S. at 270, 84 S.Ct. 710. Indeed, the Supreme Court has recognized that "federal law gives a union license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point." *Letter Carriers*, 418 U.S. at 283, 94 S.Ct. 2770. Here, the totality of the circumstances reveals that Kahele's statements were a call to arms, not assertions of objective fact. Kahele's statements are not defamatory, and therefore they are fully protected by federal labor law.[6] *See id.* at 286–87, 94 S.Ct. 2770. Accordingly, we reverse the district court's defamation judgment and vacate the court's damages award.[7]

---

6. Because we conclude that Kahele's statements are not defamatory, we need not address the parties' remaining arguments relating to the defamation issue. In particular, we do not reach the issue of "actual malice." *See Letter Carriers*, 418 U.S. at 284, 94 S.Ct. 2770("Before the test of reckless or knowing falsity can be met, there must be a false statement of fact.").

7. For the sake of clarity, we briefly address a particularly troubling aspect of the district court's damages award. The court not only awarded damages to Drace and YLDC for harm to reputation, but it also awarded damages to YLDC for economic harm caused by the strike. The court based this component of the award on two premises: (1) Kahele's defamatory statement caused the strike; and (2) the strike caused economic harm to YLDC. We find both premises problematic. Assuming *arguendo*, however, that both premises are true, the court's award of defamation damages to YLDC based on harm caused by the strike is nevertheless erroneous. The court's award conflates defamation damages with strike damages, an unjustified extension of *Linn* and its progeny. *See Linn*, 383 U.S.

at 65, 86 S.Ct. 657. Further, the court's damages award conflicts with federal labor law because, in awarding defamation damages for harm purportedly caused by peaceful strike activity, the court impermissibly applied state law to regulate the process by which a union's strike decision is made. *See* 29 U.S.C. § 157 ("Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection ...."); *Linn*, 383 U.S. at 59 n. 3, 86 S.Ct. 657 (observing that under section 7 of the NLRA "employees have the right to self organization ... and to engage in other concerted activity for mutual aid and protection"); *Int'l Union of United Auto., Aircraft and Agric. Implement Workers v. O'Brien*, 339 U.S. 454, 457, 70 S.Ct. 781, 94 L.Ed. 978 (1950) (holding that federal labor law does not "permit[ ] concurrent state regulation of peaceful strikes for higher wages. Congress occupied this field and closed it to state regulation."); *see also Amalgamaied Ass'n of Street, Electric Ry. & Motor Coach Employees,*

## B. The Employers' Appeal

### 1. Breach of the collective bargaining agreement.

The Employers contend that the district court erred in dismissing their breach of contract claim, which alleged that the Union breached the terms of the MLA. The Employers contend that because the YLDC strike was over grievances which were covered by an arbitration clause in the MLA, the district court erred in reaching the "merits" of the Union's estoppel defense. According to the Employers, where an arbitration clause is in force, equitable defenses should be decided by an arbitrator, not by a court.

■ In *California Trucking Ass'n. v. Bhd. of Teamsters & Auto Truck Drivers, Local 70*, 679 F.2d 1275 (9th Cir.1982), we observed that "when [a] contract calls for arbitral resolution of questions arising under the collective bargaining agreement," the equitable defense of repudiation is a matter to be decided in arbitration, not in court. *Id.* at 1282; *see also Local Union No. 370 of the Int'l Union of Operating Eng'rs v. Morrison–Knudsen Co., Inc.*, 786 F.2d 1356, 1358(9th Cir.1986) ("It is well-settled law that the question of whether repudiation [of a collective bargaining agreement] has occurred must normally be submitted to the arbitrator.").

In *California Trucking*, the CBA contained broad language which "required arbitration for all grievances or questions of interpretation arising under the [CBA] and all grievances or controversies affecting the mutual relations of the parties." *California Trucking*, 679 F.2d at 1285. The broad language of the grievance clause led the court to invoke the rule that the issue of repudiation "must normally be submitted to arbitration *when the contract calls*

for arbitral resolution of questions arising under the collective bargaining agreement." *Id.* at 1282 (emphasis added); *see also Morrison–Knudsen*, 786 F.2d at 1357–58 (holding that matters extrinsic to collective bargaining agreement, such as equitable defenses, must be submitted to arbitration where collective bargaining agreement required "all unsettled grievances" to be submitted to arbitration); *Auto, Marine & Specialty Painters Local No. 1176 v. Bay Area Sealers, Inc.*, 577 F.2d 609, 610(9th Cir.1978) (holding that defense of abandonment to petition to compel arbitration of grievances must be adjudicated by arbitrator where collective bargaining agreement provided for arbitration of "all disputes and grievances").

■ Here, however, the MLA does not employ broad language of the sort found in *California Trucking* and similar cases. Rather, the MLA's "Grievance Procedure" provides for arbitration only where "any employee covered under the terms of this agreement or ... the Union believes that the Employer has violated the express terms of this agreement." The MLA does not require the employer to bring its claims in arbitration, nor does it contain any language requiring grievances arising out of the MLA to be submitted to arbitration. Thus, there is nothing in the MLA that would require the district court to submit the repudiation issue to arbitration, and the court acted within its authority in ruling on the Union's repudiation defense.

■ As for the merits of the district court's ruling, in *California Trucking*, this Court found repudiation where a party expressly stated in pleadings that it was not bound by the CBA. *California Trucking*, 679 F.2d at 1284–85. Here, the Em-

*Div. 998 v. Wisconsin Employment Relations Bd.*, 340 U.S. 383, 389–90, 71 S.Ct. 359, 95 L.Ed. 364 (1951) (reiterating *O'Brien* rule).

ployers represented a number of times during negotiations that they were not bound by the MLA. Although the Employers' repudiation was not in the pleadings, the Employers' conduct is at least as egregious as that of the repudiating party in *California Trucking*. If anything, the conduct of the Employers in this case is more egregious. In pre-strike negotiations, the Employers represented that they were no longer bound by the MLA. After the strike, the Employers sued for breach of the MLA in federal court. At trial, Drace testified that the earlier repudiation was a mere bargaining position. Now, after losing in the district court, the Employers contend that the district court should not have decided the very issue that they brought before the court, and urge this Court to reverse and send the repudiation issue to an arbitrator. Under *California Trucking*, this sort of conduct constitutes repudiation of a CBA, and estops the repudiating party from relying on the CBA. *See id.* We therefore affirm the district court's dismissal of the Employer's breach of contract claim.

## 2. The RICO claim.

The Employers next contend that the district court erred in granting summary judgment to the Union on the Employers' racketeering claim. Specifically, the Employers argue that they established open-ended continuity by showing that "Kahele's regular way of controlling the Union as an enterprise is doing business with racketeering methods."

■ "A violation under section 1962(c) requires proof of: 1) conduct 2) of an enterprise 3) through a pattern 4) of racketeering activity." *Howard v. America Online Inc.*, 208 F.3d 741, 746 (9th Cir.2000) (internal citation omitted). In order to show a pattern, a complainant must demonstrate that the alleged predicate acts were both related and continuous. In turn, "to satisfy the continuity requirement,[a complainant] must prove either a series of related predicates extending over a substantial period of time, i.e., closed-ended continuity, or past conduct that by its nature projects into the future with a threat of repetition, i.e. open-ended continuity." *Howard*, 208 F.3d at 750 (citations omitted).

■ Here, the district court correctly determined that the Employers' evidence of predicate acts was limited to Union conduct related to, and occurring during, the strike of the YLDC employees. Such predicate acts, which occur entirely within the context of a single labor strike, do not "by nature" project into the future or constitute "a regular way of doing business." *See id.* If anything, the threat of ongoing activity seems highly unlikely where the strike has ended and the Union has been decertified. *See id.* at 750–51("Plaintiffs present no facts indicating that misleading advertising would continue into the future, particularly given that the problems stemmed from a one-time change in pricing policy."); *Durning v. Citibank, Int'l*, 990 F.2d 1133, 1139 (9th Cir.1993) (holding that predicate acts arising from a single event, the dissemination of a misleading document, did not satisfy open-ended continuity requirement). Accordingly, we affirm the district court's summary judgment on the racketeering claim.

## 3. Attorneys' fees.

■ Lastly, the Employers contend that the district court erred in denying their request for attorneys' fees. The Employers filed a motion in the district court for partial summary judgment due to sham answer and obstruction of justice. The district court denied both the motion and the accompanying request for attorneys' fees. The Employers do not challenge the denial of their motion for partial summary

**1012**

judgment. Rather, they challenge solely the district court's refusal to award them attorneys' fees in connection with their unsuccessful motion. As we understand the Employers' argument, they contend that they are entitled to attorneys' fees, under 28 U.S.C. § 1927,[8] because the Union's denials of allegations in the complaint were false and misleading and had the effect of multiplying the proceedings.

Significantly, the Employers do not explain why they are entitled to an award of attorneys' fees in connection with a motion that was denied by the district court. Moreover, the district court's reasoning is sound, and its conclusion correct. The court found that (1) the Employers failed to demonstrate recklessness or bad faith on the part of the Union (as required for an award of attorneys fees under section 1927, *see Barber v. Miller*, 146 F.3d 707, 711 (9th Cir.1998)); (2) the Employers failed to show how the Union's conduct "unreasonably multiplied the proceedings"; and (3) the Employers failed to provide adequate factual support for their contentions. Accordingly, the court refused to award the Employers attorneys' fees. We adopt this sound analysis and affirm the denial of the Employers' request.

### CONCLUSION

With respect to the Union's appeal challenging the district court's defamation judgment, we reverse and vacate the court's damages award. Kahele's statements are protected, and cannot serve as a basis for state tort law liability.

With respect to the Employers' claims for breach of contract and racketeering, we affirm. We also affirm the district court's denial of the Employers' request

for attorneys fees. Neither party to be awarded costs on appeal.

AFFIRMED in part, REVERSED in part.

---

8. Section 1927 provides, in pertinent part, that "Any attorney or other person ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."